NEWTON *v.* COMMISSIONERS.

1. By an act of the legislature of Ohio, passed Feb. 16, 1846, it was provided that, upon the fulfilment of certain terms and conditions by the proprietors or citizens of the town of Canfield, in Mahoning County, the county seat should be "permanently established" at that town.   Those terms and conditions having been complied with, the county seat was established accordingly.   On April 9, 1874, the legislature passed an act providing for the removal of the county seat to Youngstown.   Certain citizens of Canfield thereupon filed their bill setting forth that the act of 1846, and the proceedings thereunder, constituted, within the meaning of the Constitution, an ,executed contract the obligation of which was impaired by the later act, ,and praying for a perpetual injunction against the contemplated removal. *Held*, 1. That no such contract existed.   2. That the act of 1846 was a public law relating to a public subject with respect to which the legislature which enacted it had no power to bind a subsequent one.   3. That if that act and the proceedings under it constituted a contract, it was satisfied on the part of the State by establishing the county seat at Canfield, with the

intent that it should remain there. 4. That there was no stipulation that the county seat should remain there in perpetuity. 5. That the practical inter-pretation of the phrase "permanently established," which has been in long and frequent use in the statutes of Ohio with respect to county seats estab-lished otherwise than temporarily, is, though by no means conclusive, entitled to consideration.

2. In the interpretation of statutes like that of 1846 (*supra*), the rule is that, as against the State, nothing is to be taken as conceded but what is given in express and explicit terms, or by an implication equally clear.

ERROR to the Supreme Court of the State of Ohio.

The controversy relates to the removal of a county seat in Ohio from one town to another.

The case, briefly stated, is this: On Feb. 16, 1846, the General Assembly of that State passed "An Act to create the county of Mahoning." The first section creates the county and defines its boundaries, including among other towns Canfield and Youngstown, and declares that it "shall be known by the name of Mahoning, with the county seat at Canfield."

The fifth and eighth sections are as follows: —

"SECT. 5. That the Court of Common Pleas and Supreme Court of said county shall be holden at some convenient house in the town of Canfield until suitable county buildings shall be erected."

"SECT. 8. That before the seat of justice shall be considered per-manently established at Canfield, the proprietors or citizens thereof shall give bond with good and sufficient security, payable to the commissioners of said county, hereafter to be elected, for the sum of $5,000, to be applied in erecting public buildings for said county, and that the citizens of Canfield shall also donate a suitable lot of ground on which to erect public buildings."

To secure the permanent establishment of the county seat at Canfield, numerous citizens of that town, — some of whom are plaintiffs in this suit, — in compliance with the provisions of said sect. 8, duly executed their bond for $5,000, which was accepted by the county commissioners. A suitable lot of ground on which to erect the county buildings was also, by their pro-curement, conveyed to the county.

Thereupon said citizens erected on the lot a commodious court-house suitable for the transaction of the public busi-ness of the county, at a cost of more than $10,000, which, on June 29, 1848, the commissioners accepted in behalf of the

county, in full satisfaction of the bond, and as a full compliance with said sect. 8 ; and thenceforward the court-house was used as a seat of justice, and Canfield continued to be the county seat of the county.

April 9, 1874, the General Assembly of the State of Ohio passed the following act : —

" An Act to provide for the removal of the seat of justice of Mahoning County from the town of Canfield to the city of Youngstown in said county.

" SECT. 1. Be it enacted by the General Assembly of the State of Ohio, that from and after taking effect of this section of this act as hereafter provided, the seat of justice in the county of Mahoning shall be removed from the town of Canfield, and shall be fixed, until otherwise provided by law, at the city of Youngstown, in said county.

" SECT. 2. That the foregoing section of this act shall take effect and be in force when and so soon as the same shall be adopted by a majority of all the electors of said Mahoning County, voting at the next general election after the passage thereof, and when suitable buildings shall have been erected, as hereinafter provided.

" SECT. 3. That the electors of said Mahoning County, at the next general election after the passage of this act, shall indorse or otherwise place on their tickets either the words 'for removal' or 'against removal;' and if a majority of all the electors of said Mahoning County, voting at said election, shall vote for removal. the first section of this act shall thereafter be considered and holden to be adopted by such majority: *Provided,* that all tickets upon which the words 'for removal' shall not be indorsed or otherwise placed shall be taken and considered as votes 'against removal' as fully as though the words 'against removal' were indorsed or otherwise placed thereon.

" SECT. 4. That judges and clerks of election in the several townships, wards, and voting precincts in said county at the said general election shall cause all votes that may be so given for or against removal to be correctly counted, in doing which, all tickets upon which the words 'for removal' are not indorsed or otherwise placed shall be counted as votes 'against removal,' and shall enter and certify in their respective poll-books of said general election the number of votes so counted for as well as against such removal, which poll-books shall be returned and opened as required by the act regulating said general election and the open-

ing of the returns thereof; and the officers opening the same shall, at the same time they make, certify, and sign the abstracts required by law, also make, certify, and sign a separate abstract of all votes so returned for or against removal, showing the number so given in each township, and the footings or aggregate number given in all the townships, which abstract shall be forthwith deposited in the clerk's office of said county, and be by him forthwith recorded in the journal of the Court of Common Pleas of said county, which record, or a duly certified copy thereof, shall be taken and received as evidence for all purposes as the result of said election.

"SECT. 5. That in case a majority of the electors of said county of Mahoning shall vote 'for removal,' as heretofore provided, the seat of justice and county seat shall be deemed and taken to be removed from Canfield in said county to the city of Youngstown in said county, and to be located at said city of Youngstown: *Provided, however,* that nothing in the act shall be so construed as to authorize the removal of said seat of justice to the city of Youngstown, until the citizens of the city and township of Youngstown, and of sufficient size and suitably located to accommodate the court-house, jail, and necessary offices for said county, and shall have erected thereon, or shall have caused to have erected thereon, and completed thereon, suitable buildings for court-house, jail, and all offices and rooms necessary for the transaction of all the public business of said county, at a cost for said buildings of not less than $100,000, and to the satisfaction and acceptance of the commissioners of said county, and all such buildings shall be fully completed within two years from the date of the election at which this act shall be ratified, and said commissioner shall not, nor shall any other authority of said county, levy any tax on the taxable property of said county for said land or building: *Provided,* that the citizens of Youngstown may, within said two years, build said public buildings, and tender the same to said county commissioners.

"SECT. 6. It shall be the duty of the sheriff or coroner, as the case may be, to cause proclamation to be made to the qualified electors of said county of the time of holding said election, in the same manner as by law he is required to do in other elections, notifying said electors to vote as aforesaid on the question by which this act is submitted to them.

"SECT. 7. The sections of this act subsequent to the first section shall take effect and be in force from and after their passage."

At the next general election a majority of votes cast in the county was in favor of the removal.

Thereupon Newton, and a number of other citizens of the town of Canfield, filed their petition in the Court of Common Pleas for Mahoning County praying for an injunction restraining the board of county commissioners from removing the county seat to Youngstown. The court denied the injunction and dismissed the petition. That decision having been affirmed by the Supreme Court of the State, the petitioners brought the case here.

*Mr. James A. Garfield* for the plaintiffs in error.

The question for the determination of the court in this case is whether the act of the General Assembly of Ohio of Feb. 16, 1846, worked a contract for the permanent location of the county seat at Canfield. *Ohio Life Insurance and Trust Co. v. Debolt*, 16 How. 416. The rule that legislative grants and contracts are to be construed most favorably to the State does not tolerate the defeating of the grant or contract by any hypercritical construction. *The Binghampton Bridge*, 3 Wall. 51. Laws which amount to a proposition on the part of the State become, when accepted by individuals, binding contracts. Cooley, Const. Lim. 284; *Woodruff v. Trapnall*, 10 How. 190; *State Bank of Ohio v. Knoop*, 16 id. 369; *Furman v. Nichol*, 8 Wall. 44; *New Jersey v. Yard*, 95 U. S. 104.

The strength of the case of the plaintiffs in error lies in the fact that it is an exception to the general policy of the State in relation to the location of county seats, — a privilege, franchise, or property secured to them by a positive stipulation for a specified consideration paid to and appropriated by the State for the public benefit. Such, then, being the nature of the contract, — there being in 1846 no limitation on the power of the legislature to make it except what is claimed to be implied as necessary to the preservation of the government, — it cannot be excluded from the protection afforded by the Constitution of the United States to other contracts made by a State with its citizen . *Dartmouth College v. Woodward*, 4 Wheat. 518; *Farrington v. Tennessee*, 95 U. S. 679; *New Jersey v. Yard*, *supra*.

That the eighth section of the act, when complied with by

the citizens of Canfield, constituted a contract between them and the State for the permanent location or establishment of the county seat at that place, is beyond controversy. The contract arises out of the very words of the enactment, and the inducement held out to the citizens was to make the location permanent, upon the performance by them of the specified conditions. *New Jersey* v. *Yard, supra.*

Permanency both in the consideration and in the location of the county seat was contemplated and stipulated for by the parties. *Commissioners of Lucas County* v. *Hunt,* 5 Ohio St. 496.

The power of the legislature to make the contract on behalf of the State cannot be denied. *Ohio Life Insurance and Trust Co.* v. *Debolt, supra ; Slaughter-House Cases,* 16 Wall. 36 ; *Matheny* v. *Golden,* 5 Ohio St. 361 ; *State Bank of Ohio* v. *Knoop, supra.*

The case of *East Hartford* v. *Hartford Bridge Company* (10 How. 511), relied on by the defendants in error, has no application here. There the question turned on the public character of the parties to the grant.

*Mr. Thomas W. Sanderson* for the defendants in error.

I. If the act of February, 1846, under which the plaintiffs assert their right, did in terms amount to or express a contract or a grant, as they claim, then to that extent it was unconstitutional and void under the Constitution of the State of Ohio in force at the time of its enactment. Constitution of Ohio of 1802, art. 7, sect. 3.

1. The Supreme Court of Ohio recognize the right to remove county seats as one conferred by the Constitution of the State. *State* v. *Choate,* 11 Ohio, 512 ; *Commissioners of Putnam County* v. *Auditor, &c.,* 1 Ohio St. 324 ; *Ohio, ex rel. Evans,* v. *Dudley,* id. 445.

2. The legislature of Ohio claimed the same constitutional right and power, and continuously exercised it from the organization of the State during the existence of the Constitution of 1802. 9 Ohio Local Laws, 10 ; 3 Chase, Stats. 2101 ; 22 Ohio Local Laws, 44 ; 16 id. 93 ; 31 id. 199.

3. The construction of the Supreme Court and of the General Assembly of the State, as to the existence and scope of

the power of removing seats of justice, will not be reviewed here. *Pennsylvania College Cases*, 13 Wall. 190; *Railroad Company* v. *Georgia*, 98 U. S. 359.

4. The General Assembly, in enacting a mere local law, could not, by any contract or grant created thereby or arising therefrom, abrogate or repeal the constitutional power to remove seats of justice.

5. That power, existing at the time of the passage of the act of 1846, entered into and became a part of any contract or grant intended to arise from the act; and all parties were bound thereby. *Beer Company* v. *Massachusetts*, 97 U. S. 25; *Peck* v. *Weddell*, 17 Ohio St. 275.

6. The cases decided in the Supreme Court of Ohio, and in this court, known as the " Tax Cases," do not conflict with the foregoing. *Matheny* v. *Golden*, 5 Ohio St. 361; *State Bank of Ohio* v. *Knoop*, 16 How. 369; *Gorden* v. *The Appeal Tax Court*, 3 id. 133; *Ohio Life Insurance and Trust Co.* v. *Debolt*, 16 id. 416; *New Jersey* v. *Yard*, 95 U. S. 104; *Farrington* v. *Tennessee*, id. 679. In all these cases, the exemptions or partial exemptions from taxation were, by statutes, uniformly held to be valid and authorized by the State Constitutions; whereas, in the case at bar, it is claimed that whatever characteristic of immovability was attempted to be impressed upon the county seat at Canfield was unconstitutional.

7. The constitutional power of removal was wholly inconsistent with that of rendering a county seat immovable. The two repugnant powers could not exist in the same constitution.

II. The creation, maintenance, and regulation of courts, including the times and places of holding them, their removal from one place to another, to answer the public convenience or necessities, are matters connected with the police power of the State; and she cannot divest herself of the right, at any time, to exercise such power.

1. What is the extent and scope of the police power of the State? *Beer Company* v. *Massachusetts*, *supra*, and cases there cited; *Fertilizing Company* v. *Hyde Park*, 97 U. S. 659.

2. Courts, and the power to establish and locate them, are necessary adjuncts to an unrestricted exercise of the police

power of the State, and the power to create and maintain implies the power to remove them. The same may be said of jails and other prisons.

3. If in the exercise of this power valuable rights or franchises which have been conferred by valid enactment are destroyed or divested, no compensation can be claimed. Sedgwick, Stat. and Const. Law, 533, 534; 2 Dillon, Mun. Corp., sects. 93, 455; *Boyd* v. *Alabama,* 94 U. S. 645.

III. The word "permanently," as used in the eighth section of the act of Feb. 16, 1846, had, at the time of the passage of the act, a well-defined legislative signification.

1. It had been used to denote the manner of the location of more than thirty-five county seats in the State before that time. 3 Chase, Stats. 2100–2146.

2. Many of the seats of justice thus permanently located, by special acts of the General Assembly, were subsequently removed by similar special enactments. 63 Ohio Laws, 58; 58 id. 10; 5 Ohio St. 490.

IV. Was any contract or grant made or intended by the legislature of 1846, by the terms of the enactment in question?

1. The rule of construction to be adopted in order to construe the act is stated in *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420; *Jefferson Branch Bank* v. *Skelly,* 1 Black, 446; *Ohio Life Insurance and Trust Co.* v. *Debolt,* 16 How. 416; *The Binghampton Bridge,* 3 Wall. 51; *Fertilizing Company* v. *Hyde Park,* 97 U. S. 659.

2. The intent of the General Assembly was to do, by the act of Feb. 16, 1846, the same thing as would have been done under the General Statutes, by commissioners. 1 Chase, Stats. 353; 2 id. 1080; 2 Swan & Critch. Stats. of Ohio.

V. The defendant further claims that no contract or grant was created by the act of 1846, for the reason that there were no persons, party, or parties, that could legally accept a grant, or become a party or parties to a contract of the kind asserted. *Jackson, ex dem. Cooper,* v. *Cory,* 8 Johns. 385.

VI. What is a county? *C. W. & Z. R. R. Co.* v. *Commissioners, &c.,* 1 Ohio St. 77; *Commissioners of Hamilton County* v. *Mighels,* 7 id. 109; *Hunter et al.* v. *Commissioners, &c.,*

10 id. 515; *Boalt et al.* v. *Commissioners,* &c., 18 Ohio, 16; *Granger* v. *Pulaski,* &c., 26 Ark. 37; *McKim* v. *Odom,* 3 Blandf. 407; *St. Louis* v. *Allen,* 13 Mo. 400; *Maryland* v. *B. & O. R. R. Co.,* 3 How. 534; *Laramie County* v. *Albany County et al.,* 92 U. S. 307.

VII. The contract or grant claimed by plaintiffs is not within the protection of sect. 10 of art. 1 of the Constitution of the United States. *Dartmouth College Case,* 4 Wheat. 518; *East Hartford* v. *Hartford Bridge Co.,* 10 How. 511; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 547, 548; *Butler* v. *Pennsylvania,* 10 How. 416; *Trustees,* &c. v. *Rider,* 13 Conn. 87; *The People* v. *Roper,* 35 N. Y. 629; *Billings* v. *Hall,* 7 Cal. 1; *Dingman* v. *People,* 51 Ill. 277; *Armstrong* v. *Commissioners,* &c., 4 Blackf. (Ind.) 208; *Alley* v. *Denson,* 8 Tex. 297; *Adams* v. *Logan,* 11 Ill. 336; *Harris* v. *Shaw,* 13 id. 456; *Hambrick* v. *House,* 17 Ga. 56; *Muses* v. *Kearney,* 31 Ark. 261; *Philadelphia* v. *Fox,* 64 Penn. 180; Story, Com. Const., sects. 1392, 1393; Cooley, Const. Lim. 101, 203; *Twiford* v. *Alamakee County,* 4 Greene (Iowa), 60; *Terrett* v. *Taylor,* 9 Cranch, 51; *Attorney-General* v. *Supervisors,* &c., 33 Mich. 289.

Mr. Justice Swayne delivered the opinion of the court.

It is claimed in behalf of the plaintiffs in error that the act of the 16th of February, 1846, and what was done under it, constituted an executed contract which is binding on the State; and that the act of April 9, 1874, and the steps taken pursuant to its provisions, impair the obligation of that contract, and bring the case within the contract clause of the Constitution of the United States. Art. 1, sect. 10.

These allegations are the ground of our jurisdiction. They present the only question argued before us, and our remarks will be confined to that subject.

The case may be properly considered under two aspects : —

Was it competent for the State to enter into such a contract as is claimed to have been made?

And if such a contract were made, what is its meaning and effect?

Undoubtedly, there are cases in which a State may, as it were, lay aside its sovereignty and contract like an individ-

ual, and be bound accordingly.　*Curran* v. *State of Arkansas,* 15 How. 304; *Davis* v. *Gray,* 16 Wall. 203.

The cases in which such contracts have been sustained and enforced are very numerous.　Many of them are cases in which the question was presented whether a private act of incorporation, or one or more of its clauses, is a contract within the meaning of the Constitution of the United States.　There is no such restraint upon the British Parliament.　Hence the adjudications of that country throw but little light upon the subject.

The *Dartmouth College Case* was the pioneer in this field of our jurisprudence.

The principle there laid down, and since maintained in the cases which have followed and been controlled by it, has no application where the statute in question is a *public law* relating to a *public subject* within the domain of the general legislative power of the State, and involving the *public rights* and *public welfare* of the entire community affected by it.　The two classes of cases are separated by a broad line of demarcation.　The distinction was forced upon the attention of the court by the argument in the *Dartmouth College Case.*　Mr. Chief Justice Marshall said: —

"That anterior to the formation of the Constitution, a course of legislation had prevailed in many, if not in all, of the States, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements.　To correct this mischief by restraining the power which produced it, the State legislatures were forbidden 'to pass any law impairing the obligation of contracts;' that is, of contracts respecting property, under which some individual could claim a right to something beneficial to himself; and that since the clause in the Constitution must, in construction, receive some limitation, it may be confined, and ought to be confined, to cases of this description, — to cases within the mischief it was intended to remedy.

"The general correctness of these observations cannot be controverted.　That the framers of the Constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government, and that the

instrument they have given us is not to be so construed, may be admitted. The provision of the Constitution never has been understood to embrace other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces. . . . If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds of the college be public property, or if the State of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the State may act according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States."

The judgment of the court in that case proceeded upon the ground that the college was "a private eleemosynary institution, endowed with a capacity to take property for purposes *unconnected with the government*, whose funds are bestowed by individuals on the faith of the charter." ·

In the later case of *East Hartford* v. *The Hartford Bridge Company* (10 How. 511), this court further said : " But it is not found necessary for us to decide finally on this first and most doubtful question, as our opinion is clearly in favor of the defendant in error on the other question ; namely, that the parties to this grant did not by their charter stand in the attitude towards each other of making a contract by it, such as is contemplated in the Constitution, and so could not be modified by subsequent legislation. The legislature was acting here on the one part, and public municipal corporations on the other. They were acting, too, in relation to a *public object*, being virtually a highway across the river, over another highway up and down the river. From this standing and relation of these parties, and from the *subject-matter* of their action, we think that the doings of the legislature as to this ferry must be considered rather as *public laws* than as *contracts*. *They related to public interests*. They *changed* as those *interests* demanded. The grantees likewise, the towns being mere organizations for *public purposes*, were liable to have their public powers, rights,

and duties *modified* or *abolished* at any moment by the legislature. . . .

" It is hardly possible to conceive the grounds on which a different result could be vindicated, without destroying all legislative sovereignty, and checking most legislative improvements and amendments, as well as *supervision over its subordinate public bodies.*"

The legislative power of a State, except so far as restrained by its own constitution, is at all times absolute with respect to all offices within its reach. It may at pleasure create or abolish them, or modify their duties. It may also shorten or lengthen the term of service. And it may increase or diminish the salary or change the mode of compensation. *Butler et al.* v. *Pennsylvania*, 10 How. 402.

The police power of the States, and that with respect to municipal corporations, and to many other things that might be named, are of the same absolute character. Cooley, Const. Lim., pp. 232, 342; *The Regents* v. *Williams*, 4 Gill & J. (Md.) 321.

In all these cases, there can be no contract and no irrepealable law, because they are " governmental subjects," and hence within the category before stated.

They involve *public interests*, and legislative acts concerning them are necessarily *public laws.* Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of repeal and modification which the former had of enactment, neither more nor less. All occupy, in this respect, a footing of perfect equality. This must necessarily be so in the nature of things. It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require. A different result would be fraught with evil.

All these considerations apply with full force to the times and places of holding courts. They are, both purely public things, and the laws concerning them must necessarily be of the same character.

If one may be bargained about, so may the other. In this respect there is no difference in principle between them.

The same reasoning, pushed a step farther in the same direction, would involve the same result with respect to the seat of government of a State.

If a State capital were sought to be removed under the circumstances of this case with respect to the county seat, whatever the public exigencies, or the force of the public sentiment which demanded it, those interested, as are the plaintiffs in error, might, according to their argument, effectually forbid and prevent it; and this result could be brought about by means of a bill in equity and a perpetual injunction.

It is true a State cannot be sued without its consent, but this would be a small obstacle in the way of the assertion of so potent a right. Though the State cannot be sued, its officers, whose acts were illegal and void, may be. *Osborn* v. *Bank of the United States*, 9 Wheat. 738; *Davis* v. *Gray*, 16 Wall. 203.

A proposition leading to such consequences must be unsound. The parent and the offspring are alike. *Armstrong* v. *The Commissioners* (4 Blackf. (Ind.) 208) was, in some of its features, not unlike the case before us. The act declared that " so soon as the public buildings are completed in the manner aforesaid, *at the place designated*, the same shall *be for ever* thereafter the permanent seat of justice of said county of Dearborn." Certain private individuals there, as here, had stipulated to build a court-house, and their compliance was a condition precedent. The condition had been performed. It was held that " the act did not create a contract." The subject was fully considered. It was held further, that a subsequent legislature might competently pass an act for the removal of the county seat so established. In that case, both had been done and both were sustained. The reasoning of the court was substantially the same with ours touching the eighth section of the act of 1846 here in question. *Elwell and Others* v. *Tucker* (1 id. 285) was also a case arising out of the removal of a county seat. The court said, " the establishment of the time and place of holding courts is *a matter of general legislation*, respecting which the act of one session of the General Assembly cannot be binding on another." See also *Adams* v. *The County of Logan*, 11 Ill. 336, and *Bass* v. *Fanthroy*, 11 Tex. 698. They are to the same effect.

Secondly, But conceding, for the purposes of this opinion, that there is here a contract, as claimed by the plaintiffs in error, then the question arises, What is the contract; or, in other words, to what does it bind the State?

The rules of interpretation touching such contracts are well settled in this court. In *Tucker* v. *Ferguson* (22 Wall. 527) we said: "But the contract must be shown to exist. There is no presumption in its favor. Every reasonable doubt should be resolved against it. Where it exists, it is to be rigidly scrutinized, and never permitted to extend *either in scope or duration* beyond what the terms of the concession clearly require." There must have been a deliberate intention clearly manifested on the part of the State to grant what is claimed. Such a purpose cannot be inferred from equivocal language. *Providence Bank* v. *Billings*, 4 Pet. 514; *Gilman* v. *City of Sheboygan*, 2 Black, 510.

It must not be a mere gratuity. There must be a sufficient consideration, or, no matter how long the alleged right has been enjoyed, it may be resumed by the State at its pleasure. *Christ Church* v. *Philadelphia*, 24 How. 300. No grant can be raised by mere inference or presumption, and the right granted must be clearly defined. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420.

"The rule of construction in this class of cases is that it shall be most strongly against the corporation. Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court." *Fertilizing Company* v. *Hyde Park*, 97 U. S. 659.

The eighth section of the act of 1846 declares, "That before the seat of justice shall be considered permanently established at the town of Canfield, the proprietors or citizens thereof shall" do certain things, — all of which, it is admitted, were done in due time. This is the whole case of the plaintiffs in error. It will be observed that there is nothing said about the county seat *remaining*, or being *kept*, at Canfield *for ever*, or *for any*

*specified time,* or "permanently." At most, the stipulation is that it shall be *considered as permanently established there* when the conditions specified are fulfilled. If the legislature had intended to assume an obligation that it should be *kept there* in perpetuity, it is to be presumed it would have said so. We cannot — certainly not in this case — interpolate into the statute a thing so important, which it does not contain. The most that can be claimed to have been intended by the State is, that when the conditions prescribed were complied with, the county seat should be then and thereupon "permanently established" at the designated place. We are, therefore, to consider what is the meaning of the phrase "permanently established." Domicile is acquired by residence and the *animus manendi,* the intent to remain. A *permanent residence* is acquired in the same way. In neither case is the idea involved that a change of domicile or of residence may not thereafter be made. But this in no wise affects the pre-existing legal *status* of the individual in either case while it continues. So the county seat was permanently established at Canfield when it was placed there with the *intention* that it should remain there. This fact, thus complete, was in no wise affected by the further fact that thirty years later the State changed its mind and determined to remove, and did remove, the same county seat to another locality. It fulfilled at the outset the entire obligation it had assumed. It did not stipulate *to keep* the county seat at Canfield perpetually, and the plaintiffs in error have no right to complain that it was not done. *Keeping it there* is another and a distinct thing, in regard to which the eighth section of the act is wholly silent. In *Mead* v. *Ballard* (7 Wall. 290), land was conveyed on the 9th of August, 1848, "upon the express understanding and condition" that a certain institution of learning then incorporated "shall be permanently located on said land," between the date of the deed and the same day in the succeeding year. The trustees passed a resolution, within the year, locating the institution on the premises, and at once contracted for the erection of the necessary buildings. The buildings were completed, and the institution was in full operation by November, 1849.

In the year 1857 the buildings were destroyed by fire and

were not rebuilt. A part of the land was sold by the grantee. The heir of the grantor sued in ejectment to recover the premises. This court, speaking by Mr. Justice Miller, said : "It is clear to us . . . that when the trustees passed their resolution locating the buildings on the land, with the intention that it should be the permanent place of conducting the business of the corporation, they had permanently located the institution, within the true construction of the contract. Counsel for the plaintiff attach to the word ' permanent' a meaning inconsistent with the obvious intent of the parties, — that the condition was one which might be fully performed within a year. Such a construction is something more than a condition to locate. It is a covenant to build and rebuild; a covenant against removal at any time ; a covenant to keep up an institution of learning on that land for ever, or for a very indefinite time. This could not have been the intention of the parties."

In *Harris* v. *Shaw* (13 Ill. 463), land was conveyed on condition that the county seat should be " permanently located " upon it. The location was made accordingly with that intent, but some years later the county seat was removed. The grantor sued to recover the land. The court said it was no part of the contract that the county seat should *remain for ever* on the premises; that the grantor must be presumed to have known that the legislature had the power to remove it at pleasure, and that he must be held to have had in view at least the probability of such a change when he made the deed.

There is no point arising under either the former or the present Constitution of Ohio which in our judgment requires any remark.

The results of the elaborate research of one of the counsel for the defendants in error show that the phrase " permanently established " is a formula in long and frequent use in Ohio, with respect to county seats established otherwise than temporarily. Yet it is believed this is the first instance in the juridical history of the State in which such a claim as is here made has been set up.

This practical interpretation of the meaning of the phrase, though by no means conclusive, is entitled to grave and respectful consideration.

*Judgment affirmed.*