Samuel T. ROY, Justice of the Peace, et al., Plaintiffs,

v.

Benjamin R. JONES, Chief Justice of the Supreme Court of Pennsylvania, et al., Defendants.

Civ. A. No. 71-1211.

United States District Court, W. D. Pennsylvania.

June 16, 1972.

Savage, Finkel & Love, Pittsburgh, Pa., for plaintiffs.

Frederick N. Frank, J. Shane Creamer, Atty. Gen., Joseph J. Pass, Jr., Pittsburgh, Pa., for defendants.

## OPINION

SCALERA, District Judge.

1.

Plaintiffs are justices of the peace in Allegheny County who have been temporarily suspended from office by order of the Supreme Court of Pennsylvania upon recommendation of the Judicial Inquiry and Review Board. They have instituted this action pursuant to 42 U.S. C.A. § 1983, 28 U.S.C.A. § 1343 and 28 U.S.C.A. § 1331, requesting that this court (1) enjoin enforcement of the suspension order because they were suspended without notice and a hearing in violation of their constitutional rights to procedural due process, and in violation of the Rules of Procedure Governing the Judicial Inquiry and Review Board,[1] and (2) enjoin the Judicial Inquiry and Review Board from conducting hearings and making further recommendations to the Supreme Court in their case because the Board can no longer be considered an impartial tribunal, having already recommended suspension of plaintiffs, and because the combining of the functions of prosecution, judge and jury in one panel violates their due process rights.

Plaintiffs further aver that the application of the Rules of Conduct, Office Standards and Civil Procedure for Justices of the Peace,[2] promulgated by the Supreme Court and for the violation of which they have been suspended as "holdover" justices of the peace violates their constitutional rights in that the rules are arbitrary and capricious, deny them equal protection, constitute retro-

---

1. The rules of procedure which govern the Judicial Inquiry and Review Board were adopted by order of the Supreme Court of Pennsylvania on June 27, 1969, effective July 1, 1969.

2. The Rules were adopted by orders of the Supreme Court of Pennsylvania on February 18, 1969 and October 15, 1969, effective January 1, 1970.

active legislation and impair the obligations of contract.

Defendants have moved to dismiss this action for the reasons that the complaint fails to state a claim on which relief can be granted, the federal court lacks jurisdiction, and that defendants are immune from suit. Defendants' motion is now before this court.

### 2.

The plaintiffs were elected to the office of justice of the peace in the General Election of November 4, 1967 for a term of six years. Their terms expire on the first Monday of January 1974. They were commissioned by the Governor of Pennsylvania pursuant to his authority under Article V, § 11, as amended November 2, 1909, of the old Constitution of 1874.

The plaintiffs are compensated solely by the receipt of fees, which fees are determined by statute, and they receive no salary or other compensation for services rendered as justices of the peace.

The plaintiffs did not choose to stand for re-election in the General Election conducted November 4, 1969 and, as authorized by the Constitution of 1968, are therefore "holdover" justices of the peace who were elected and commissioned under the Constitution of 1874 and who are scheduled to remain in office only until the expiration of their term.

At the time of their election to office, the plaintiffs were not prohibited from holding the office of justice of the peace while concurrently being employed by the Commonwealth or any of its political subdivision, or holding office in a political party or political organization, or participating in partisan activity.

The Rules of Conduct, under authority contained in Article V, §§ 10(a) and 17 (b) of the 1968 Constitution prohibit such activity. Rule 2 provides:

"A. A *justice of the peace* shall not hold office in a political party or political organization, *or hold an office or position of profit in the government of the United States, the Commonwealth or any political subdivision thereof,* except in the armed services of the United States or the Commonwealth.

"B. A *justice of the peace* shall not engage in partisan political activity. He shall not deliver political speeches, make or solicit political contributions, publicly endorse candidates for political office or participate in party conventions; but nothing herein shall prevent the justice of the peace from making a political contribution to his own campaign or to a campaign of a member of his immediate family, or from attending or speaking at political gatherings in behalf of his own candidacy."

Rule 7 of the Rules of Conduct defines justice of the peace to mean any justice of the peace, including those elected or appointed to a term of office commencing before, on or after January 1, 1970, thus by definition bringing "holdover" justices of the peace within the code of conduct.

On May 29, 1970, the Supreme Court of Pennsylvania denied the Petition for Assertion of Original Jurisdiction for Review and Clarification of the Pennsylvania Rules of Conduct, Office Standards and Procedure for Justice of the Peace. On July 2, 1970, upon reconsideration, the Supreme Court of Pennsylvania granted the petition of the Squires and Constables Association of Pennsylvania, Inc., Allegheny County Chapter, for rehearing of the original petition. Petition of Squires and Constables of Pennsylvania, Inc., 442 Pa. 502, 275 A.2d 657 (1971).

The association of justices of the peace and constables contended that the Supreme Court of Pennsylvania had no right under the Constitution of 1968 or otherwise to promulgate any rule changing or diminishing any of the rights or powers which the justices of the peace of Pennsylvania possessed prior to the Constitution of 1968. The court specifically rejected the contention of the petitioners, dismissed the request to hold the rules invalid or unconstitutional, noted that petitioners' contention ignored all of the changes embodied in the new Constitution and the rules adopted under

it, and Article V, § 1 thereof which creates a unified judicial system for the Commonwealth, including all courts and justices of the peace, and § 10(a) thereof which provides that the "Supreme Court shall exercise general supervisory and administrative authority over all the courts and justices of the peace." The court upheld the constitutionality of the rules and specifically found that the rules were binding on all justices of the peace, even those elected before January 1, 1970. No appeal was taken.

Pursuant to the authority of Article V, § 18(k) of the Constitution of 1968, which provides that the Supreme Court shall prescribe rules of procedure for the suspension, removal, discipline and compulsory retirement of justices of the peace, the Supreme Court of Pennsylvania adopted Rules of Procedure Governing Judicial Inquiry and Review Board. The Rules of Procedure were made specifically applicable to justices of the peace in Rule 23(b).

These rules provide that the Judicial Inquiry and Review Board, which is composed of three judges of the Court of Common Pleas, two judges of the Superior Court, two non-judge members of the bar of the Supreme Court and two non-lawyer electors shall investigate, conduct hearings and make a recommendation to the Supreme Court with respect to allegations of misconduct on the part of justices of the peace.

The rules provide a judge shall be notified of an investigation by the Board, if the matter proceeds beyond the preliminary inquiry stage, and afforded a reasonable opportunity to present such matters as he may choose. In the event charges against the judge are pursued, a hearing is to be scheduled at which the judge has the right to be represented by counsel, to examine and cross-examine witnesses, and to present evidence in his own behalf. A judge may object to the findings and report of the Board, in which case he has the right to another hearing before the Board prior to presentation of the record of proceedings and findings of the Board to the Supreme Court for determination.

On April 20, 1971, Henry Ellenbogen, the President Judge of the Common Pleas Court of Allegheny County, sent a letter to each of the plaintiffs, stating that it was his belief that the plaintiffs were in violation of Rule 2(a) of the Rules of Conduct, and that in his opinion the plaintiffs could not legally continue to hold the office of justice of the peace and be employed by a political subdivision of the Commonwealth and/or hold office in a political party or political organization.

Pursuant to a recommendation by the Judicial Inquiry and Review Board, the Supreme Court of Pennsylvania issued an order on May 19, 1971, suspending thirty-four justices of the peace from office pending final determination of the matter by the Judicial Inquiry and Review Board and further order of the court. Plaintiffs had not been notified of any investigation or proceedings pending before the Board with respect to themselves, nor were they given an opportunity to appear and present facts in their defense. Subsequent to their suspensions, plaintiffs were formally notified of the institution of formal charges against them. They have formally answered the charges and a hearing before the Board has been scheduled.

On June 1, 1971, plaintiffs, together with the Squires and Constables Association of Pennsylvania and other suspended justices of the peace, petitioned the Supreme Court of Pennsylvania to revoke its order of May 19, 1971. This petition was denied by order of court dated July 14, 1971.

Subsequently, on August 23, 1971, plaintiffs, together with the Squires and Constables Association of Pennsylvania, Inc., and other suspended justices of the peace, applied to Honorable William Brennan, Associate Justice of the United States Supreme Court and Circuit Justice for the Third Circuit, for a stay of the order of the Supreme Court of Pennsylvania suspending the justices of the peace pending the filing of a petition for certiorari and a final determination of the matter by the Supreme Court of the United States. Justice Brennan denied

the application on September 13, 1971. No petition for certiorari with respect to the suspension order of the Supreme Court of Pennsylvania was filed with the Supreme Court of the United States.

Suit in this court was filed on December 30, 1971, on which date the petition of the plaintiffs for a temporary restraining order was denied. A hearing on the plaintiffs' request for a preliminary injunction was held on January 10, 1971. On the same date a motion to dismiss was filed by defendants.

At the hearing the court was advised that a stipulation of facts would be presented by the parties in order that the issues could be crystallized for the court. The court specified the time in which the stipulation was to be filed and directed the filing of briefs on the issue of the motion to dismiss.

The stipulation of facts was filed by the parties on January 13, 1972. Defendants' brief in support of its motion to dismiss was filed on January 28, 1972. Plaintiffs' briefs were filed on February 4 and February 11, 1972.

### 3.

█ Plaintiffs contend that they have been denied procedural due process in derogation of the United States Constitution because they were temporarily suspended without notice and a hearing.

It is stipulated that approximately one month before they were suspended, plaintiffs received a letter from Judge Ellenbogen, the President Judge of the Court of which plaintiffs are a part, advising them that he believed them to be in violation of Rule 2(a) of the Rules of Conduct. We do not need to reach the question of whether this letter is sufficient notice prior to suspension.

There is no question but that plaintiffs have suffered injury as a result of their temporary suspensions. The sole method by which plaintiffs are compensated as justices of the peace is by receipt of fees for the performance of their services. Plaintiffs have received no remuneration as justice of the peace since their suspension. Theoretically, if the suspension is wrongful, they would be entitled to recover the fees they would have earned during the period they were unlawfully removed from office. See Adams v. Rubinow, 157 Conn. 150, 251 A.2d 49 (1968); Friedman v. State, 24 N.Y.2d 528, 301 N.Y.S.2d 484, 249 N.E. 2d 369 (1969); Vega v. Borough of Burgettstown, 394 Pa. 406, 147 A.2d 620 (1959); Coble v. School District of Township of Metal, 178 Pa.Super. 301, 116 A.2d 113 (1955).

However, this court finds the interest of the state in protecting the public and preserving the integrity of the judiciary outweighs the interests of the members of the minor judiciary to a notice and hearing prior to temporary suspension, pending proceedings on the merits.

The decisions and functions of a justice of the peace have great impact on the community. It is said that the citizen's experience with the law is often limited to contact with this level of the judiciary. Therefore, it is important not only that the integrity of the justice of the peace be preserved but that the appearance of integrity be maintained.

" 'The place of justice is a hallowed place; and therefore not only the bench but the foot-pace and precincts, and purprise thereof ought to be preserved without scandal and corruption . . . .' So spoke Sir Francis Bacon in the 16th century. (Bacon, 'Of Judicature', as quoted in Handbook for Judges 25, 27, Am.Jud.Soc.1961.) For generations before and since it has been taught that a judge must possess the confidence of the community; that he must not only be independent and honest, but, equally important, believed by all men to be independent and honest. A cloud of witnesses testify that 'justice must not only be done, it must be seen to be done.' Without the appearance as well as the fact of justice, respect for the law vanishes in a democracy. As most recently observed by one of our colleagues on the federal bench, 'Even casual followers of the news media during the past few months must be aware of the fact that the nation is experiencing a deep crisis of confidence in its judiciary. [There

is a] widespread impression that the courts are falling far short of discharging their duty to provide both justice and the appearance of justice.' We have but lately had occasion to remark the erosion of confidence in our courts in a case involving the functioning of the very court of which Judge Greenberg is a member." (Edward Allen Tamm, Judge of the United States Court of Appeals for the District of Columbia, "Are Courts Going the Way of the Dinosaur?", 57 A.B.A. Journal 229 (March 1971). In re Greenberg, 442 Pa. 411, 415, 280 A.2d 370, 372 (1971).

In Ransford v. Graham, 374 Mich. 104, 131 N.W.2d 201 (1964), the constitutionality of restraining a probate judge from exercising the duties of his office was upheld as a proper exercise of the higher court's general superintending control over inferior courts, even though it did not have the power to remove the judge and the legislature refused to remove him, "for the purpose of protecting the purity of judicial processes and maintaining public confidence in the administration of justice." p. 203. The judge was alleged to have attempted to coerce a loan from one of the estates he was probating and to have commingled probate funds with his own funds. See also Keiser v. Bell, 332 F.Supp. 608 (E.D.Pa. 1971); Mahoning County Bar Assoc. v. Franko, 168 Ohio St. 17, 151 N.E.2d 17 (1950).

In Fair v. Kirk, 317 F.Supp. 12 (N.D. Fla.1970), affirmed 401 U.S. 928, 91 S. Ct. 935, 28 L.Ed.2d 210 (March 1971, rehearing denied, 403 U.S. 941, 91 S.Ct. 2245, 29 L.Ed.2d 722), the temporary suspension of a state official without opportunity to be heard was upheld. The court said at page 17:

"Cognizant of the definitional difference between 'suspension' and 'removal', we hold merely that eradication of corrupt practices in state government is such an important responsibility that suspension of a public official

prior to a hearing may be consonant with due process. In a case such as this, the state interest in utilizing suspension to preserve the integrity of its offices surely outweighs any individual interest in a pre-suspension hearing."

One of the reasons for this rule prohibiting a member of the minor judiciary from employment by the government is to protect the community from any conflict of interest or bias which might result from the combining of the two occupations. The judiciary is to be independent of and protected from other branches of government, so that they will not and cannot be influenced in their judicial decisions. Whether plaintiffs are in fact engaged in dual occupations was not stipulated as a fact in this case. This is a matter which is currently being heard by the Judicial Inquiry and Review Board and decided by the Pennsylvania Supreme Court.[3] We are satisfied, in light of the allegation that thirty-four justices of the peace are engaged in political activity or otherwise employed by the government, that it is proper for the Supreme Court of Pennsylvania to temporarily suspend them, pending a full hearing at which each will have the opportunity to defend himself prior to final removal.

**4.**

▮ Plaintiffs' contention that the Judicial Inquiry and Review Board is biased because they previously recommended suspension of plaintiffs is groundless. The Board has no financial interest in the outcome of the proceedings. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); Commonwealth Coatings Corp. v. Continental Casualty, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968); nor has the Board or its members suffered a personal affront from plaintiffs which might serve to color the objectivity with which they weigh the matter. In Re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942

3. Although we note the named plaintiff justices of the peace in Petition of Squires and Constables of Pennsylvania,

Inc., 442 Pa. 502, 275 A.2d 657 (1971), alleged they were holding another job in derogation of Rule 2(a).

(1955); Berryhill v. Gibson, 331 F.Supp. 122 (M.D.Ala.1971); nor do the facts reveal that the members of the Board have any personal interest in the suspension of the plaintiff justices of the peace.

The Board's initial determination and recommendation to the Supreme Court of Pennsylvania stemmed from their authorized participation in the cases. Rule 1 of the Rules of Procedure directs the Board to make an initial investigation for the purpose of determining whether formal proceedings should be instituted.

The Supreme Court of the United States has said:

> "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed. 778 (1966).

The fact that the court before whom the proceeding is pending has made a previous determination unfavorable to plaintiffs

> "Personal bias or prejudice such as would disqualify a judge does not include bias based on a previously expressed view of the law, *or based on a previous decision against a litigant* or an adverse ruling during the course of litigation." (emphasis added) Riojas v. Turner, 304 F.Supp. 559 (D. Utah 1969); Knoll v. Socony Mobil Oil Co., 369 F.2d 425 (10th Cir. 1966); Barnes v. United States, 241 F.2d 252 (9th Cir. 1956); Martin v. United States, 285 F.2d 150 (10th Cir. 1960), cert. denied 365 U.S. 853, 81 S.Ct. 818, 5 L.Ed.2d 817, rehearing denied 366 U.S. 915, 81 S.Ct. 1088, 6 L.Ed.2d 239.

or even that the court has a predisposition on the merits

> "Bias or prejudice sufficient to disqualify a judge is said to be 'a prejudice that is directed against the party litigant and is of such a nature and character as would render it improbable that the party could have a fair

and impartial trial in the particular case pending.'" In re MacKay, 416 P.2d 823 at 837 (1966 S.Ct. Alaska).

> "The fact that we may have an opinion as to the merits of the case or how it should be decided different from that of respondent is not enough to make us biased or prejudiced." Ibid.

has been held not to constitute bias.

Even if the Board is biased, which this court finds it is not, "the determination made by the Board will not be a final adjudication; it will merely be a recommendation which may be approved or disapproved by the Supreme Court." Keiser v. Bell, 332 F.Supp. 608 (E.D.Pa. 1971). The final responsibility for making a decision rests exclusively with the Supreme Court, based on a review of the entire record of proceedings before the Board. Rules of Procedure, Rule 18. If the Supreme Court finds the record to be deficient or improper in any respect, it may permit additional evidence to be admitted or refer the matter back to the Board for additional proceedings. Ibid. As the Supreme Court will be making the decision with the benefit of the entire record, plaintiffs will be protected from any alleged bias of the Judicial Inquiry and Review Board.

The Rules of Procedure require that the Board make a preliminary investigation, hold hearings, and make a recommendation to the Supreme Court before the latter body may make a final determination. Under the "rule of necessity" a court or administrative agency will not be disqualified to determine factual issues before it on grounds of prejudice, bias or pre-judgment of issues when there is no statutory provision for change of venue or when no other court or agency has the power to act. Federal Home Loan Bank v. Long Beach Fed. S. & L. Ass'n, 295 F.2d 403 (9th Cir. 1961); Marquette Cement Mfg. Co. v. Federal Trade Commission, 147 F.2d 589 (7th Cir. 1945). See Marsh v. Buck, 313 U.S. 406, 61 S.Ct. 969, 85 L.Ed. 1426 (1940); Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct.

793, 92 L.Ed. 1010 (1947); In Re Mac-Kay, supra. (The court pointed out it was the only body authorized to make a determination in disbarment proceedings. In such circumstances the court deemed it their duty to act.)

### 5.

█ Plaintiffs' contention that the functioning of the Board as prosecutor, judge and jury violates their right of procedural and/or substantive due process is also without merit. The combining of investigatory and adjudicatory functions in a single officer, absent bias, is constitutionally valid. Keiser v. Bell, supra.

### 6.

As we have indicated, the Pennsylvania Supreme Court has fully litigated the issue of the constitutionality of Rule 2 (a) of the Rules of Conduct under the Pennsylvania Constitution. Petition of Squires and Constables of Pennsylvania, Inc., supra.

We note one of the allegations in the petition to the Supreme Court of Pennsylvania in this case:

"Your Petitioner, by this Petition, do not deny the historical power of and authority inherent in this honorable Court to prescribe procedural rules applicable equally to the so-called 'pre-1970 minor judiciary'—which includes your Petitioners—and to all members of the new minor judiciary, these officers elected pursuant to the 1968 Pennsylvania Constitution." Petition for Assertion of Original Jurisdiction for Review and Clarification of the Pennsylvania Rules of Conduct, Office Standards, and Procedures for Justices of the Peace. Paragraph 12.

However, the named plaintiffs in the principal case are not the same as the named plaintiffs in Petition of Squires and Constables of Pennsylvania, Inc. Ibid.

█ The application of the Rules of Conduct to plaintiffs does not violate their constitutional rights. It is fundamental law that the contract clause of the Constitution does not prohibit a state from changing the duties or salaries of its officers.

"The legislative power of a state, except so far as restrained by its own Constitution, is at all times absolute with respect to all offices within its reach. It may at pleasure create or abolish them, or modify their duties. It may also shorten or modify their duties. It may also shorten or lengthen the term of service. And it may increase or diminish the salary or change the mode of compensation." Newton v. Mahoning County, 100 U.S. 548, 559, 25 L.Ed. 710, 711 (1880).

█ Some of the reasons for this well-established law are discussed in Butler v. Pennsylvania, 51 U.S. 402, 416, 10 How. 402, 416, 13 L.Ed. 472 (1850):

"The contracts designed to be protected by the tenth section of the first article of that instrument are contracts by which perfect rights, certain definite, fixed private rights of property, are vested. These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or state government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require. The selection of officers, who are nothing more than agents for the effectuating of such public purposes, is matter of public convenience or necessity, and so, too, are the periods for the appointment of such agents; but neither the one nor the other of these arrangements can constitute any obligation to continue such agents, or to re-appoint them, after the measures which brought them into being shall have been found useless shall have been fulfilled, or shall have been abrogated as even detrimental to the well-being of the public. The promised compensation for services actually performed and accepted, during the continuance of the particular agency, may undoubtedly be claimed, both upon principles of compact and of equity; but to insist beyond this on the perpetuation of a

public policy either useless or detrimental, and upon a reward for acts neither desired nor performed, would appear to be reconcilable with neither common justice nor common sense. The establishment of such a principle would arrest necessarily everything like progress or improvement in government; or if change should be ventured upon, the government would have to become one great pension establishment on which to quarter a host of sinecures. It would especially be difficult, if not impracticable, in this view, ever to remodel the organic law of a State, as constitutional ordinances must be of higher authority and more immutable than common legislative enactments, and there could not exist conflicting constitutional ordinances under one and the same system."

Furthermore, a retroactive or retrospective law which does not impair the obligation of contract is not unconstitutional. Satterlee v. Mathewson, 27 U.S. 380, 2 Pet. 380, 7 L.Ed. 458 (1829).

There are good reasons, and we have noted some of them, for prohibiting a justice of the peace from being employed by a governmental subdivision or participating in politics. Such a rule is clearly not arbitrary and capricious nor is it violation of plaintiffs' rights to equal protection under the law. The law applies equally to all justices of the peace, whether elected and commissioned before or after the adoption of the 1968 Constitution.

### 7.

Defendants contend that this court lacks jurisdiction for the reason that a federal court may not enjoin the proceedings of a state court. 28 U.S.C.A. § 2283 provides:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

█ The Civil Rights Act, 42 U.S.C.A. § 1983,

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

is in this Circuit an express exception to the Anti-Injunction statute. Cooper v. Hutchinson, 184 F.2d 119 (3rd Cir. 1950); De Vita v. Sills, 422 F.2d 1172 (3rd Cir. 1970); Grove Press, Inc. v. City of Philadelphia, 418 F.2d 82 (3rd Cir. 1969).

However, the court must proceed to the additional question of whether federal intervention is appropriate in this case. DeVita v. Sills, supra; Gebert v. Hoffman, 328 F.Supp. 574 (E.D.Pa. 1971); Lane v. McDevitt, 255 F.Supp. 413 (E.D.Pa.1966).

Even when not barred by the Anti-Injunction Act, federal courts are extremely reluctant to interfere with state proceedings. One of the reasons for this rule is to avoid needless friction between state and federal courts in law enforcement. Another reason is that state courts are particularly well equipped to handle state matters. To preserve the integrity of each judicial system, jurisdiction of the federal courts should be exercised "[only] with a proper regard for [state courts] in carrying out their domestic policy." Burford v. Sun Oil Co., 319 U.S. 315, 317–318, 63 S.Ct. 1098, 1099, 87 L.Ed. 1424 (1943), rehearing denied, 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851; Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), rehearing denied, 360 U.S. 940, 79 S.Ct. 1442, 3 L.Ed.2d 1552.

" '[The Civil Rights Act] should be construed so as to respect the proper balance between the States and the federal government in law enforcement.' Screws v. United States, 325 U.S. 91, 108, 65 S.Ct. 1031, 89 L.Ed.

1495, 1506; . . . . . '[It is] not to be used to centralize power so as to upset the federal system.' Collins v. Hardyman, 341 U.S. 651, 658, 71 S.Ct. 937, 95 L.Ed. 1253, 1257, . ." Stefanelli v. Minard, 342 U.S. 117, 121, 72 S.Ct. 118, 121, 96 L.Ed. 138, 143 (1951).

"This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism,' and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.' The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future.

"This brief discussion should be enough to suggest some of the reasons why it has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669, 675 (1971).

It is well established that it is improper for federal courts to interfere in state criminal proceedings absent a showing of irreparable injury which is clear and imminent. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), rehearing denied 319 U.S. 782, 63 S.Ct. 1170, 87 L.Ed. 1726; Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951); Dambrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Younger v. Harris, supra.

The mere fact that an individual would have to defend himself in a good faith state criminal proceeding does not of itself constitute irreparable injury justifying federal intervention. Bad faith and/or harassment of some other unusual circumstance must be shown as well. Younger v. Harris, supra.

In his concurring opinion in Younger v. Harris, supra, Mr. Justice Stewart suggests that a different rule may apply in civil cases, although, as he points out, the Anti-Injunction Act makes no distinction between civil and criminal proceedings. We have no doubt that the abstention doctrine applies to state civil matters. Gebert v. Hoffman, supra; DeVita v. Sills, supra.

The "irreparable injury" test has been utilized in many cases in determining whether to abstain from or entertain actions to enjoin state civil proceedings. DeVita v. Sills, supra.

In Sarisohn v. Appellate Div. Second Dept., S. Ct. of N. Y., 265 F.Supp. 455 (E.D.N.Y.1967), the court dismissed an action seeking to enjoin state proceedings to remove a state district judge for cause upon finding injury was not clear and imminent. In Gebert v. Hoffman, supra, the court decided it would be im-

proper to intervene in state civil proceedings initiated to enjoin student sit-in demonstrations. There had been no allegation or showing of bad faith, harassment, or any other unusual circumstance constituting irreparable injury.

The court in Berryhill v. Gibson, 331 F.Supp. 122 (M.D.Ala.1971), decided federal intervention would be appropriate upon a finding that the Board of Optometrists, before whom plaintiff optometrists' suspension proceedings were pending, had a direct pecuniary interest in plaintiffs' suspensions. In Taylor v. Kentucky State Bar Association, 424 F. 2d 478 (6th Cir. 1970), the court of appeals reversed the district court's dismissal of the case on grounds it had no jurisdiction over the subject matter. It was held that the district court had jurisdiction to entertain an action to enjoin disbarment proceedings which, it was alleged, were instituted with no real hope of ultimate success but to intimidate, harass and punish a criminal lawyer who had made a career of the defense of unpopular causes and controversial clients.

In Taylor, Ibid, at p. 481, the court stated:

"A general rule, inherent in American Federalism, is that courts of the United States will not interfere with a state's enforcement of its local laws. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). A *fortiori* should this rule apply where the dispute is of a peculiarly local character, as is this one. It has long been recognized that the states have 'autonomous control over the conduct of their officers, among whom * * * lawyers are included,' Theard v. United States, 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957), and that the state supreme courts and bar associations bear the primary and often painful responsibility of policing the profession. *See* Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917). Nevertheless, the Supreme Court has instructed that where a plaintiff alleges 'highly unusual and very limited circumstances,' that is:

. . . . (2) a probability of irreparable injury, which is established if there is a showing of a significant chilling effect on speech that cannot be avoided by state court adjudication.' Sheridan v. Garrison, 415 F.2d 699, 709 (5th Cir. 1969), cert. denied, 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed. 2d 685 (1970) . . . . , the court may interfere."

See also Kennan v. Warran, 328 F.Supp. 525 (W.D.Wis.1971), in which the court issued a temporary restraining order enjoining a state civil action seeking to restrain Dr. Kennan from performing an abortion and the state medical board from suspending the doctor based on the same ground.

■ We think the test of irreparable injury used in deciding whether to intervene in state criminal proceedings is the appropriate criteria to use in deciding whether intervention is appropriate in this case. State disciplinary proceedings are similar in many ways to state criminal proceedings. Furthermore, a state's legal system is at the very heart of those affairs which it has the right to administer without interference from the federal government. Sarisohn v. Appellate Division, Second Dept., S. Ct. of State of N. Y., 265 F.Supp. 455 (E.D. N.Y.1967), Taylor v. Kentucky State Bar Association, 424 F.2d 478 (6th Cir. 1970), Saier v. State Bar of Michigan, 293 F.2d 756 (6th Cir. 1961); see Mac-Kay v. Nesbett, 285 F.Supp. 498 (D. Alaska 1968).

■ Plaintiffs have alleged nothing which leads us to believe the proceedings to suspend plaintiffs now pending before the Judicial Inquiry and Review Board and the Supreme Court are not good faith state proceedings. Plaintiffs' constitutional rights to procedural due process have not been violated. The fact that the Judicial Inquiry and Review Board previously recommended temporary suspension of plaintiffs, pending a hearing on the merits, does not constitute bias. Nor does the fact

that the Board performs prosecutional and quasi-judicial functions violate due process. Plaintiffs' temporary suspension is a part of these good faith proceedings. In light of the state interest in preserving the integrity of the judiciary and protecting the public, we find this temporary suspension to be constitutional and in good faith.

Plaintiffs have not suffered or are likely to suffer irreparable injury. We cannot assume without basis that plaintiffs will be treated improperly.

[The] "mere apprehension that the state court will not adequately protect a federal right is not sufficient basis for the issuance of an injunction." Chandler v. O'Bryan, 445 F.2d 1045, 1058 (10th Cir. 1971), Dambrowski v. Pfister, supra, Lane v. McDevitt, supra.

Accordingly we deem it appropriate to abstain.