*142 Opinión disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Disiento enérgicamente del curso seguido por una mayoría de este Tribunal por entender que mediante la opinión que hoy se emite se quebrantan los principios de autolimitación judicial y la doctrina de justiciabilidad. Las preguntas certificadas ante nuestra consideración no cumplen con los requisitos de justiciabilidad para una certificación interjurisdiccional, por lo que estamos impedidos de atender las cuestiones presentadas. Además, disiento por entender que, en el interés de trazar la política pública del país desde el estrado, la mayoría emite un juicio consultivo sobre cuestiones que no fueron presentadas ante este Foro y que, de facto, las atendió el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito. En claro desafío a las normas más básicas de un sistema judicial federalista, la mayoría pretende revocar las determinaciones de ese Tribunal.
Mediante un galimatías jurídico se pretende atornillar en su puesto no tan sólo al Procurador de las Personas con Impedimentos, sino también a otros funcionarios nombrados el cuatrienio pasado por una administración contraria a la que hoy dirige el gobierno. Ello así pues, como sabemos, la presente administración, como parte de un proceso de reorganización del gobierno ante las dificultades fiscales que atraviesa, ha propuesto que las procuradurías, así como otros organismos gubernamentales, se eliminen y que distintas agencias de gobierno absorban sus funciones. Por lo tanto, esta opinión consultiva no sólo pretende afectar al Procurador de las Personas con Impedimentos, sino que adelanta el criterio de este Tribunal sobre todos aquellos otros funcionarios que se verían afectados por la restructuración gubernamental.
Más grave aún, con este dictamen se quiere impedir que *143 la Asamblea Legislativa cumpla con su responsabilidad constitucional de legislar la política pública de una Administración. En el pasado reciente indiqué, en ocasión de otro dislate judicial, que en el futuro, “ante un resultado electoral desfavorable para ciertos sectores del país”, seríamos testigos de actuaciones cuyo propósito consistiría en “impedir que la siguiente administración del gobierno pudiera [...] darle curso a su proyecto de país”. In re Solicitud Aumentar Núm. Jueces TS, 180 DPR 54, 142 (2010) (Rodríguez Rodríguez, J., opinión disidente). ¡Qué lástima para el país que tuviera razón!
Examinemos los hechos del caso según éstos surgen de la solicitud de certificación del Tribunal de Distrito Federal para el Distrito de Puerto Rico y los documentos que la acompañan.
I
El 22 de junio de 2011, el entonces Gobernador de Puerto Rico y presidente del Partido Nuevo Progresista (PNP), Hon. Luis G. Fortuño Burset, firmó y convirtió en ley el Plan de Reorganización Núm. 1 de 2011, conocido como el Plan de Reorganización de las Procuradurías (Plan de Reorganización). Mediante éste, se reorganizó la estructura vigente que gobernaba la administración y operación de las distintas procuradurías del País(1) mediante la derogación de todas las leyes que regían tales entidades gubernamentales, y se creó la Oficina de Administración de las Procuradurías, a la cual se le concedieron nuevas funciones y se le delegaron las que tenían las procuradurías hasta entonces vigentes.(2) A esos efectos, el Plan de Reor *144 ganización consistió en tres etapas simultáneas, a saber: la eliminación de las procuradurías existentes al derogar las leyes que las crearon; la creación de la Oficina de Administración de las Procuradurías, oficina en la que se consolidaron todas las facultades, funciones y deberes administrativos de las procuradurías; y la creación de las nuevas procuradurías, entre éstas la Procuraduría de las Personas con Impedimentos, las cuales estaban adscritas a la administración de la Oficina de Administración de las Procuradurías.(3)
Debido a la creación de las nuevas procuradurías, en el Plan de Reorganización se dispuso que los procuradores de cada oficina serían nombrados por el Gobernador de Puerto Rico, con el consejo y consentimiento del Senado, por un término de diez (10) años. Por tal razón, quienes hasta entonces ocupaban la dirección de las procuradurías abolidas por el Plan de Reorganización cesaron en sus funciones, y el Gobernador inició un proceso de nombramiento o renombramiento con respecto a las procuradurías recién creadas. Conforme a las disposiciones del Plan de Reorganización, el 15 de noviembre de 2011, el entonces Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, nombró al señor Iván Díaz Carrasquillo al puesto de Procurador de las Personas con Impedimentos por un término de diez (10) años.
El 6 de noviembre de 2012, el Hon. Alejandro García Padilla, senador y presidente del Partido Popular Democrático (PPD), fue electo al cargo de Gobernador del Estado Libre Asociado de Puerto Rico en las elecciones generales del País. Asimismo, la señora Rossana López León fue electa al cargo de Senadora por Acumulación en el Senado *145 de Puerto Rico como miembro del PPD. El 5 de febrero de 2013, la ahora senadora López León presentó varios proyectos relacionados con el funcionamiento y la administración de las procuradurías en Puerto Rico para mejorar el servicio que ofrecen.
En lo que atañe a la controversia ante nuestra consideración, los proyectos P. del S. 352 y P. del S. 355 presentados por la senadora se convirtieron en la Ley Núm. 75 de 24 de julio de 2013 (Ley Núm. 75) y en la Ley Núm. 78 de 24 de julio de 2013 (Ley Núm. 78), respectivamente. Específicamente, en la Ley Núm. 75 se dispuso que ésta entraría en vigor en un término de treinta (30) días a partir de su aprobación, tiempo que se utilizaría para transferir todo tipo de recursos de la abolida Oficina de Administración de las Procuradurías a las procuradurías de recién creación, entre éstas, la Procuraduría para las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico (Procuraduría para las Personas con Impedimentos). Así las cosas, durante el periodo de transición, el señor Iván Díaz Carrasquillo recibió una notificación de que el Gobernador había designado a la señora Margaret Morales para dirigir el Comité de Transición, según lo dispuesto en las Leyes Núms. 75-78. La notificación indicaba que la señora Margaret Morales se encargaría de dirigir la transición entre “la extinta Oficina del Procurador de las Personas con Impedimentos y la nueva Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico”. Apéndice del recurso de certificación interjurisdiccional, Documento 20-5.
A tales efectos, para finales de agosto, miembros del Comité de Transición sostuvieron varias reuniones con el señor Díaz Carrasquillo para finiquitar todo lo relacionado con el proceso de transición. Finalizadas las reuniones de transición, a éste se le notificó que había cesado en sus funciones como Procurador de las Personas con Impedimentos. Posteriormente, el 26 de agosto de 2013, el señor Díaz Carrasqui *146 lio supo que el Gobernador se disponía a nombrar a un procurador interino para dirigir la Oficina de la Procuraduría de las Personas con Impedimentos y que, además, se estaban evaluando candidatos para ocupar el cargo de procurador en propiedad. Luego, mediante carta suscrita por la Secretaria de la Gobernación, Hon. Ingrid M. Vila Biaggi, se le informó que el Gobernador había nombrado al señor Ramón Calzada como procurador interino de la Oficina del Procurador de las Personas con Impedimentos.
El 27 de agosto de 2013, el señor Díaz Carrasquillo presentó ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico (Tribunal de Distrito) una demanda por discrimen político, violación a su derecho al debido proceso de ley, y daños y perjuicios, en contra de las siguientes personas: el gobernador de Puerto Rico, Hon. Alejandro García Padilla, en su carácter personal y oficial; la senadora Rossana López León, en su carácter personal y oficial; la señora Margaret Morales, en su carácter personal y oficial como miembro del Comité de Transición; y el señor Gabriel Esterrich-Lombay, en su carácter personal y oficial como miembro del Comité de Transición.
En síntesis, alegó que su destitución estuvo motivada por razones de índole político-partidista por éste ser afiliado del PNP. Indicó que la acción del gobernador vulneraba su derecho a la libertad de expresión y su derecho a la libertad de asociación. Aseveró que por haber sido nombrado por un término de diez (10) años, término que no había vencido, tenía un derecho propietario sobre su puesto y sólo podía ser removido por justa causa y conforme al debido proceso de ley. El demandante solicitó una partida en daños y que se dictara un remedio interdictal, de suerte que pudiera permanecer en su puesto. El 28 de agosto de 2013, el Tribunal de Distrito emitió una orden en la que concedió la orden de interdicto provisional y solicitó a las partes mostrar causa por las cuales el Tribunal no debía conceder el remedio de permitir que el demandante *147 permaneciera en su empleo, según solicitó, siendo éste un funcionario ejecutivo con funciones cuasijudiciales. A su vez, solicitó al demandante que demostrara la naturaleza del interés propietario que reclamaba sobre su empleo.
El 3 de septiembre de 2013, el demandante presentó una moción en cumplimiento con la orden y en ésta hizo los señalamientos que sintetizamos a continuación. Alegó que se le había violado su derecho a la libertad de expresión toda vez que la razón para removerlo de su posición era su afiliación al PNP. Además, sostuvo que como su nombramiento a una posición ejecutiva que ejerce funciones cuasijudiciales fue por un término de diez (10) años, tiene un derecho propietario sobre su empleo y sólo podía ser removido por justa causa. Por lo tanto, señaló que se violó su derecho a un debido proceso de ley porque no le entregaron una carta de terminación y por haber sido removido de su posición sin cumplir con el requisito de justa causa.
En esa misma fecha, la parte demandada presentó una moción en cumplimiento con la orden emitida por el Tribunal de Distrito. En lo pertinente, sostuvo que el señor Díaz Carrasquillo no había sido destituido o despedido de su empleo, sino que al derogarse el Plan de Reorganización que creaba su puesto y crearse una nueva Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico, en virtud de las Leyes Núms. 75-78, sus funciones habían cesado. Añadió que, según lo resuelto en Gómez v. Negrón, 65 DPR 305 (1945), la derogación del Plan de Reorganización y la creación de la nueva Procuraduría daban cuenta del cese de sus funciones.
Por tal razón, sostuvo que el señor Díaz Carrasquillo no tenía un derecho propietario sobre su empleo porque la Asamblea Legislativa, acorde con su poder constitucional, abolió el puesto del señor Díaz Carrasquillo mediante la derogación del Plan de Reorganización y creó la nueva Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico, oficina que encaraba *148 nuevas facultades y responsabilidades. Además, alegó que de concederse el remedio interdictal solicitado, se violaría el principio de inmunidad soberana que establece la Enmienda XI de la Constitución de Estados Unidos, LPRA, Tomo 1.
Ese mismo día, el señor Díaz Carrasquillo presentó su oposición a la moción presentada por la parte demandada. Allí negó que el puesto dejó de existir porque se derogó el Plan de Reorganización y se creó una nueva Oficina del Procurador, puesto que las funciones de la nueva Oficina del Procurador eran, esencialmente, las mismas que tenía la Oficina del Procurador bajo el Plan de Reorganización. Por consiguiente, sostuvo que no aplicaba la doctrina establecida en Gómez, supra. No obstante, añadió que la aplicación de tal doctrina, según alegó la parte demandada, era contraria a lo resuelto en Hernández, Romero v. Pol. de P.R., 177 DPR 121 (2009), donde se sostuvo que ni la Asamblea Legislativa ni el gobernador pueden aprobar leyes que lesionen o ignoren los derechos adquiridos de un ciudadano. Finalmente, alegó que la Sección 1983 del Código de Estados Unidos, 42 USC, permite que se demande al Estado cuando se violan los derechos, privilegios e inmunidades que garantizan las leyes y la Constitución de Estados Unidos. Por ende, sostuvo que no procedía la doctrina de inmunidad soberana.
Luego de varios trámites procesales, el Tribunal de Distrito citó a las partes a que comparecieran a una vista argumentativa para dilucidar si el Procurador de las Personas con Impedimentos, tanto bajo el Plan de Reorganización como según la Ley Núm. 78, ejerce funciones cuasiejecutivas y cuasijudiciales. Trabada así la controversia, el 27 de septiembre de 2013, el Tribunal de Distrito expidió un injunction preliminar a favor del demandante por entender que éste tenía la probabilidad de prevalecer en los méritos, toda vez que demostró que el Procurador de las Personas con Impedimentos ejerce funciones cuasiejecutivas y cuasijudiciales.
*149 No obstante, por tener reservas en cuanto al estado de Derecho puertorriqueño sobre la constitucionalidad de imponer un requisito de justa causa a las facultades del gobernador para remover a un funcionario que ejerce funciones cuasiejecutivas y cuasijudiciales, certificó las siguientes preguntas: Si el Procurador de Personas con Impedimentos de Puerto Rico tiene un derecho propietario limitado sobre su empleo por el resto del término de su nombramiento, sujeto al requisito de “justa causa” según definido por la ley. Si el requisito de “justa causa” impuesto al gobernador para remover al demandante de su empleo constituye una interferencia con sus facultades de cumplir y hacer cumplir las leyes, al igual que su facultad de formular e implementar la política pública. Qué factores debe considerar el tribunal al hacer tal determinación y, de existir un derecho propietario limitado bajo las leyes de Puerto Rico, si al amparo de la doctrina de inmunidad parlamentaria, según alegada por los demandados, el demandante pierde ese derecho (Traducción nuestra).(4)
Inconformes con la determinación del Tribunal de Distrito de conceder el injunction preliminar, los demandados instaron una apelación interlocutoria ante el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito (Tribunal de Apelaciones para el Primer Circuito). En el recurso instado, los demandados impugnaron la orden del foro primario federal en la que se concedió el injunction preliminar y se certificaron las preguntas ante la consideración de este *150 Foro. No obstante a la presentación de una apelación ante el foro apelativo federal, certificamos las cuestiones presentadas por el Tribunal de Distrito.
Pendiente la certificación ante la consideración de este Tribunal, el 16 de abril de 2014, el Tribunal de Apelaciones para el Primer Circuito revocó el “injunction” preliminar concedido por el Tribunal de Distrito. El foro apelativo federal concluyó que erró el Tribunal de Distrito al ignorar un elemento esencial en la resolución de esta controversia: la eliminación del puesto del Procurador mediante la Ley Núm. 75. Ese foro apelativo descartó que en este caso la controversia se tratara sobre la destitución que efectuó el gobernador de un funcionario ejecutivo que ejerce funciones cuasiejecutivas y cuasijudiciales, sino más bien, como indicamos, de la eliminación de un puesto por virtud del válido ejercicio legislativo de promulgar o derogar leyes. Siendo ello así, dejó sin efecto el injunction preliminar emitido por entender que el demandante no estableció que tenía probabilidad de prevalecer en los méritos. El Tribunal de Apelaciones Federal sostuvo que el puesto que ejercía el demandante fue abolido válidamente por la Asamblea Legislativa al aprobar la Ley Núm. 75 y el demandante no argumentó, ni demostró, que este cuerpo no tenía el poder para abolir su posición. Sostuvo que, después de todo, “[r]epeal is an act unquestionably within the ken of the Puerto Rico Legislature and thus is fatal to Diaz’s legal position”. (Citas omitidas). Díaz Carrasquillo v. García-Padilla, No. 13-2277, Slip Opinion, pág. 9 (ler Cir. 16 de abril de 2014). Además, el foro apelativo federal determinó que la abolición del puesto en controversia no violaba la Constitución del Estado Libre Asociado de Puerto Rico debido a que, a base de lo establecido por este Tribunal en Gómez v. Negrón, supra, el procurador no tenía un derecho propietario sobre el puesto. Inconforme, el 30 de abril de 2014, el señor Díaz Carrasquillo presentó ante el Tribunal de Apelaciones para el Primer Circuito un Petition for Rehearing en Banc. El 9 de mayo de 2014, la petición fue denegada.
*151 Así las cosas, el 8 de mayo de 2014, el señor Díaz Carrasquillo presentó ante este Tribunal una Moción Urgente Solicitando Orden de Paralización en Auxilio de la Jurisdicción de este Tribunal. Solicitó que emitiéramos una or-den que paralizara cualquier acto por parte del Gobernador para remover al señor Díaz Carrasquillo de su puesto como procurador hasta que nos expresáramos acerca de las preguntas certificadas. Alegó que la decisión del Tribunal de Apelaciones para el Primer Circuito atentaba contra los principios básicos del federalismo al éste no abstenerse hasta que finalizara el procedimiento de certificación. Asimismo, entendió que el foro apelativo intermedio resolvió incorrectamente la controversia ante su consideración, por lo cual este Tribunal debía ejercer su jurisdicción exclusiva y atender las preguntas certificadas para evitar que el demandante sea removido del puesto en violación al derecho propietario que alega poseer.(5) Para todos los efectos prácticos, nos solicitó que revocáramos al Tribunal de Apelaciones para el Primer Circuito.
El 13 de mayo de 2014, la parte demandada presentó una urgente oposición a la moción presentada por la parte demandante y solicitó la anulación del auto de certificación. Alegó que procedía denegar de plano la moción presentada por la parte demandante porque este Tribunal tiene jurisdicción sólo sobre las preguntas certificadas y no sobre las partes ni sobre los méritos de la reclamación ante el foro federal. Por esto, indicó que el Tribunal no puede paralizar válidamente los efectos del dictamen del Tribunal de Apelaciones para el Primer Circuito, como tampoco procede revisar su determinación.
Por su parte, el Estado argumentó que si la parte demandante deseaba que el foro apelativo federal se abstu *152 viera tenía que haberlo solicitado oportunamente, lo cual no hizo. Finalmente, los demandados solicitaron la anulación del auto de certificación al concluir que el Tribunal de Distrito partió de premisas equivocadas al certificar las preguntas ante este Tribunal. Esto, porque como bien determinó el foro apelativo federal, en este caso no medió la remoción de un funcionario público sino la abolición de su puesto como un ejercicio legítimo de la Asamblea Legislativa. Debido a lo anterior, sostiene que no se cumple con el requisito de que el asunto certificado sea determinante en el resultado del caso, puesto que ya el foro apelativo federal determinó que el demandante carece de un interés propietario sobre el puesto en controversia y no se ha cuestionado ante este Tribunal con respecto al poder de la Asamblea Legislativa de abolir puestos. Por lo tanto, si este Tribunal contesta las preguntas certificadas estaría emitiendo, en esencia, una opinión consultiva. Posteriormente, ambas partes presentaron sus respectivas réplicas y dúplicas.
1—I HH
Como cuestión de umbral, debemos evaluar si las preguntas certificadas cumplen con los requisitos de justiciabilidad y de certificación interjurisdiccional.
A
La doctrina de la justiciabilidad gobierna el ejercicio válido del poder judicial. Esta doctrina “nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real en obtener un remedio que haya de afectar sus relaciones jurídicas”. E.L.A. v. Aguayo, 80 DPR 552, 558-559 (1958). Mediante nuestros pronunciamientos en ese caso, adoptamos la normativa federal sobre la doctrina de justiciabilidad y señalamos que para el ejercicio válido del poder judicial se requiere la exis *153 tencia de un “caso o controversia” real. Según hemos señalado, los límites del ejercicio del poder judicial, autoimpuestos mediante la doctrina de justiciabilidad, son necesarios porque constituyen “un mínimo de condiciones para el ejercicio discreto y tolerable de un poder que de otro modo constituiría una clara amenaza para la calidad democrática del sistema y convertiría a los jueces en guardianes de la comunidad”. Id., pág. 597. Al analizar los fundamentos adjudicativos del Juez Asociado Raúl Serrano Geyls en E.L.A. v. Aguayo, supra, el profesor Carlos E. Ramos González señala que
[...] la visión [del Juez Serrano Geyls] sobre la naturaleza de los tribunales refleja un jurista preocupado por el rol de una rama judicial que opera bajo un sistema de separación de poderes. Al establecer estas premisas esenciales, la opinión allana el camino para declinar la invitación que le haría la rama ejecutiva para que la rama judicial facilite una fundamental obra de gobierno. Se trata en efecto de un cauteloso ejercicio del poder y una visión prudente sobre la naturaleza de los tribunales, asumida en un tiempo histórico donde las grandes mayorías simpatizaban con la posición que entonces asumía la rama ejecutiva. C.E. Ramos González, Derecho Constitucional: E.L.A. v. Aguayo o los albores de la independencia judicial puertorriqueña, 34 Rev. Jur. U. Inter. PR 633,636 (2000).
Añade el profesor Ramos González que “en el contexto histórico en que se produce la opinión, el Tribunal de forma dialéctica sienta una base fundamental del derecho patrio en tanto reafirma decididamente la independencia judicial”. Id., pág. 640. Por lo tanto, en aras de proteger el balance tripartito entre las ramas de gobierno —particularmente, el ejercicio del poder judicial para actuar como un consejo supremo de las determinaciones de otras ramas—, decidimos autolimitar el alcance de nuestro poder judicial.(6) Véase, *154 además, Flast v. Cohen, 392 US 83, 96-97 (1968). Desde entonces, y pese a cuestionamientos legítimos sobre la sapiencia de nuestra determinación en E.L.A. v. Aguayo, supra, hemos reiterado lo allí establecido.(7) Brau, Linares v. ELA et als., 189 DPR 1068 (2013); Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893, 907 (2010); Noriega v. Hernández Colón, 135 DPR 406 (1994).
Así, como corolario de la doctrina de justiciabilidad, los tribunales nos está vedado emitir opiniones consultivas. Asoc. Alcaldes v. Contralor, 176 DPR 150 (2009); Ortiz v. F.E.I., 155 DPR 219 (2001); Com. de la Mujer v. Srio. de Justicia, 109 DPR 715 (1980). Hemos definido opinión consultiva “como la ponencia legal emitida por un tribunal cuando no tiene ante su consideración un caso o una controversia justiciable y cuyo resultado, por lo tanto, no es obligatorio”. Asoc. Alcaldes, supra, pág. 158. Así, pues, la doctrina de opinión consultiva intenta evitar que se produzcan decisiones en el vacío, en el abstracto, o bajo hipótesis de índole especulativa, ya que no es función de los tribunales actuar como asesores o consejeros. íd. Esto es, una controversia no es justiciable cuando un tribunal debe pasar juicio sobre un asunto hipotético para beneficio de una o ambas partes en cuanto a una situación o conducta futura y especulativa. De lo contrario, actuaríamos como una tercera cámara o consejo supremo capaz de poner un veto final a las actuaciones de las ramas que encarnan la voluntad democrática de los ciudadanos. Com. de la Mujer, supra; E.L.A. v. Aguayo, supra.
B
Por su parte, en nuestro ordenamiento procesal civil, el mecanismo de certificación interjurisdiccional está regu *155 lado por la Regla 25 del Reglamento de este Tribunal, 4 LPRA Ap. XXI-A, y el Art. 3.002f de la Ley de la Judicatura de 2003, Ley Núm. 21 de 22 de agosto de 2003 (Ley de la Judicatura de 2003), 4 LPRA sec. 24s(f). Este mecanismo permite que un tribunal federal pueda someter ante este Tribunal, para una contestación definitiva, cuestiones dudosas o noveles del Derecho puertorriqueño que podrían determinar el resultado de un pleito ante el tribunal que solicita nuestra intervención. Pan Ame. Comp. Corp. v. Data Gen. Corp., 112 DPR 780, 783 (1982).
A su vez, permite “mitigar las tensiones inherentes a un sistema de justicia federalista [...]”. Santana v. Gobernadora, 165 DPR 28, 42 (2005). De esta forma se pretende evitar la intromisión federal en la función legislativa del Estado y los roces innecesarios entre ambas jurisdicciones, al tiempo que se promueve el cooperativismo judicial federal a través de un mecanismo sencillo y eficiente para las partes en litigio. Nota, Inter-jurisdictional Certification: Beyond Abstention Toward Cooperative Judicial Federalism, 111 U. Pa. L. Rev. 344, 350 (1963). Por lo tanto, bien utilizado, el mecanismo de certificación fortalece tanto el sistema judicial de los estados y del Estado Libre Asociado de Puerto Rico como el sistema judicial del gobierno federal.
Es necesario señalar que, históricamente, se cuestionó la justiciabilidad de las preguntas certificadas mediante el mecanismo de certificación interjurisdiccional en aquellos estados en que estaban vedadas las opiniones consultivas.(8) Véase Comment, Inter-Jurisdictional Certification and Full Faith and Credit in Federal Courts: To Certify or Not to Certify, Is that a Question?, 45 Wash. L. Rev. 167 (1970). La preocupación principal era la posibilidad de atender una controversia mediante certificación sin que se cumpliese con el requisito de “caso o controversia”. Algunas jurisdicciones optaron por reconocer las opiniones consultivas; otras acep *156 taron el mecanismo de certificación inteijurisdiccional sujeto a que el mismo cumpliese con la doctrina de justiciabilidad. J.B. Corr e I.P. Robbins, Interjurisdictional Certification and Choice of Law, 41 Vand. L. Rev. 411, 419-422 (1988). En el caso de Puerto Rico, desde un inicio hemos establecido que las certificaciones inteijurisdiccionales deben cumplir cabalmente con la doctrina de justiciabilidad. Pan Ame. Comp. Corp., supra, pág. 790. Es decir, “[l]a controversia jurídica que suscita la certificación tiene que originarse en un caso o controversia real entre las partes. [...] De lo contrario, podría inducirse a una opinión consultiva que afecta la legitimidad y efectividad del dictamen adjudicativo”. H.E. Vicente Cuesnongle, O.P. v. D.A.C.O., 119 DPR 457, 463-464 (1987) (Hernández Denton, J., Op. Concurrente).
Por consiguiente, el mecanismo de certificación inteijurisdiccional no altera nuestra responsabilidad de velar porque, al contestar las preguntas certificadas, no eludamos los criterios de autolimitación judicial propios de la doctrina de justiciabilidad adoptada por este Tribunal. Así, para que proceda una certificación inteijurisdiccional, hemos establecido una serie de requisitos para, por un lado, delimitar el alcance de nuestra intervención y, por otro, cumplir con la doctrina de justiciabilidad. Estos son: (1) las preguntas certificadas deben involucrar cuestiones de Derecho puertorriqueño; (2) no deben existir precedentes claros que dispongan correctamente del asunto; (3) las preguntas deben poder determinar el resultado del pleito ante el foro que certifica, y (4) la certificación debe contener una relación de los hechos relevantes a la controversia, de forma tal que demuestren la verdadera naturaleza de la controversia. Guzmán v. Calderón, 164 DPR 220, 228 (2005); Pan Ame. Comp. Corp., supra, pág. 788.(9)
*157 Los últimos dos requisitos, en particular, garantizan que para que una certificación interjurisdiccional sea atendida por este Foro, se cumpla con la doctrina de justiciabilidad. Pan Ame., supra, pág. 790. Por un lado, el tercer requisito exige que la determinación de este Tribunal pueda tener un efecto concreto en la controversia, y por otro, el cuarto requisito requiere que los hechos que acompañan a la certificación demuestren la verdadera naturaleza de la controversia que amerita ser atendida por este Foro. En ausencia de un cumplimiento cabal con estos requisitos, estamos impedidos de atender las cuestiones presentadas mediante una certificación intexjurisdiccional.
C
Según la relación de hechos que el Tribunal de Distrito presentó en la solicitud de certificación y los fundamentos para emitir el injunction preliminar, la controversia en este caso se ciñe a determinar si el requisito de justa causa impuesto al gobernador para remover al Procurador de las Personas con Impedimentos, un funcionario ejecutivo que también ejerce funciones cuasijudiciales(10) y es nombrado por un término de diez (10) años, incide sobre la facultad del gobernador para cumplir y hacer cumplir las leyes. El foro federal de instancia, sorprendentemente, obvió un elemento o hecho fundamental e imprescindible al asunto planteado, a saber: la aprobación de la Ley Núm. 75 que derogó el cargo que el demandante ejercía. Ese hecho fundamental e imprescindible no pasó desapercibido para el Tribunal de Apelaciones para el Primer Circuito. Este dejó sin efecto el injunction preliminar emitido por el foro primario federal, razonando, correctamente, que la verdadera controversia en *158 este caso versaba sobre la eliminación del puesto de un funcionario ejecutivo mediante una legislación y no sobre la acción tomada por el Primer Mandatario de destituir a un funcionario que ejerce funciones cuasilegislativas y cuasijudiciales.
Luego de examinar con detenimiento los hechos de este caso, según surgen de la solicitud de certificación del Tribunal de Distrito y los documentos que la acompañan, coincidimos con el parecer del Tribunal de Apelaciones para el Primer Circuito: la controversia ante la consideración del Tribunal de Distrito versaba sobre la eliminación o abolición del puesto de un funcionario ejecutivo mediante una legislación y no sobre la destitución de un funcionario ejecutivo que ejerce funciones cuasijudiciales. Consecuentemente, entendemos que las preguntas certificadas ante nuestra consideración, las cuales se fundamentan en la alegada destitución de un funcionario que ejerce funciones cuasijudiciales efectuada por el Primer Ejecutivo no cumplen con los requisitos de una certificación interjurisdiccional. Por consiguiente, procede, luego de aplicar correctamente el Derecho, anular el recurso de certificación.
Es decir, un análisis sin ánimo prevenido de la solicitud de certificación y de los documentos que la acompañan nos lleva a concluir cuál es la verdadera naturaleza de la controversia en este caso, a saber: determinar si el señor Díaz Carrasquillo tenía algún derecho o interés propietario sobre su puesto, oponible a la facultad de la Asamblea Legislativa de crear, consolidar o reorganizar departamentos ejecutivos, de acuerdo con la Constitución del Estado Libre Asociado de Puerto Rico.
Como bien concluyó el Tribunal de Apelaciones para el Primer Circuito, basta analizar el tracto fáctico de este caso para concluir que la Asamblea Legislativa es la responsable de que, mediante su poder de legislación, se aboliera la Oficina del Procurador de las Personas con Impedimentos, en *159 tonces adscrita a la Oficina de Administración de las Procuradurías. Ello provocó que, incidentemente, se eliminara el puesto del señor Díaz Carrasquillo. Por tal razón, es irrelevante que nos pronunciemos sobre el interés propietario del señor Díaz Carrasquillo vis a vis los límites al poder del gobernador para removerlo y los criterios que debe evaluar el Tribunal de Distrito para adjudicar esa diatriba constitucional, según sugieren las preguntas certificadas. Por lo tanto, para resolver este caso conforme a derecho, no procede que ejerzamos nuestra jurisdicción para atender y contestar las preguntas certificadas por el foro federal, que no cumplen con el requisito de contener una relación de los hechos relevantes a la controversia, de forma tal que demuestre la verdadera naturaleza de la controversia.
De igual forma, tampoco procedía evaluar si un individuo pierde un derecho propietario limitado al entrar en conflicto con la doctrina de inmunidad parlamentaria. Esa cuestión presentada no es más que otro trampantojo jurídico. Cuando se alega que el Estado afecta un derecho o interés propietario, la actuación estatal se evalúa al amparo de la cláusula del debido proceso de ley. En este caso, el Gobernador invocó la doctrina de inmunidad parlamentaria, no frente al supuesto de un interés o derecho propietario del demandante, sino ante el reclamo de la parte demandante de sufrir discrimen político. Tal reclamo fue presentado mediante una acción civil federal de privación de derechos según la Sección 1983, 42 USC see. 1983. Dentro de ese contexto, el Gobernador argumentó que por razón de la inmunidad parlamentaria, extendida a éste por el acto legislativo de firmar y aprobar los estatutos en controversia, los foros judiciales estaban impedidos de entrar a considerar alegaciones sobre supuestas motivaciones discriminatorias por el hecho de aprobar los estatutos.(11) Eso *160 es un asunto que le compete dirimir al foro federal.(12) Por tal razón, emitir un juicio sobre esa cuestión no solo falla en reconocer el verdadero asunto de derecho planteado, sino que se arriesga a discutir un asunto cuyo efecto, a lo sumo, es inocuo.
Por su parte, y consustancial a lo anterior, toda vez que las preguntas certificadas no atienden la verdadera controversia en este caso, la determinación de este Foro respecto a las cuestiones presentadas no será determinante para el resultado del pleito ante el foro federal. Es decir, cualquier determinación sobre las preguntas certificadaconstituye la emisión de una opinión consultiva —o un extenso dictum— sobre cuestiones que, según analizamos, no s *161 son pertinentes ni determinantes para la resolución de esta controversia. Ya el Tribunal de Apelaciones para el Primer Circuito emitió una determinación sobre la verdadera controversia ante la consideración del Tribunal de Distrito: el interés propietario de un funcionario ejecutivo cuando su puesto es abolido por la Asamblea Legislativa. A no ser que el interés de la mayoría sea revocar al Tribunal de Apelaciones para el Primer Circuito, facultad que le compete al Tribunal Supremo de Estados Unidos, sito en Washington DC.
Reiteramos, el foro apelativo intermedio federal concluyó que dado que la Asamblea Legislativa abolió el puesto del procurador al aprobar la Ley Núm. 75, “Díaz had no property interest, i.e., no ‘right’, in the Advocate position”. Díaz-Carrasquillo v. García-Padilla, No. 13-2277, Slip Opinion, págs. 9-10 (ler Cir. 16 de abril de 2014). Por lo tanto, cualquier determinación nuestra sobre las preguntas certificadas requeriría entrar a atender asuntos que fueron válidamente adjudicados por el Tribunal de Apelaciones para el Primer Circuito, foro con jurisdicción sobre las partes en esta controversia.(13) Por tal razón, en riesgo de emitir una opinión consultiva, procede que se anule el recurso de certificación interjurisdiccional ante nuestra consideración.
*162 No obstante a lo anterior, hoy, una mayoría de este Tribunal, en claro incumplimiento con la doctrina de justiciabilidad y los requisitos de una certificación interjurisdiccional, se adentra a contestar las preguntas certificadas. Además, por razones exógenas al Derecho, una mayoría de este Tribunal cede ante la petición de la parte demandante y se expresa sobre asuntos que no están ante nuestra consideración pero que tienen graves repercusiones en el ámbito político. Ello, en la medida de que intenta pasar juicio sobre cierta legislación pendiente ante la consideración de la Asamblea Legislativa. En otras palabras, la opinión consultiva que hoy se emite opera como una censura previa que pretende impedir que la Asamblea Legislativa legisle.
Es lamentable que en casos como éste, en que se discuten asuntos de política pública de una administración en particular, una mayoría esté dispuesta a abdicar toda noción básica sobre autolimitación judicial y sobre los principios de un sistema judicial federalista. Parecería ser que con el tiempo retrocedemos de aquel momento en que velábamos por el cauteloso ejercicio del poder judicial y de nuestra visión prudente sobre la naturaleza de los tribunales; momentos que, en palabras del profesor Ramos González, configuraron los albores de la independencia judicial. Ramos González, supra, pág. 636. En días como éstos me pregunto: ¿qué queda de ella?
Dado que una mayoría de este Tribunal adelanta, mediante la opinión consultiva que hoy se emite, el criterio sobre el interés propietario de un funcionario ejecutivo cuyo *163 puesto la Asamblea Legislativa abolió mediante legislación, nos vemos obligados a disentir de su apreciación “en los méritos”.
I—I
A
La Constitución establece que ninguna persona puede ser privada de su propiedad sin un debido proceso de ley. Art. II Sec. 7, Const. ELA, LPRA, Tomo 1. Este derecho tiene su contraparte en las Enmiendas V y XIV de la Constitución de Estados Unidos, LPRA, Tomo 1. El debido proceso de ley se manifiesta en dos modalidades: la modalidad sustantiva y la modalidad procesal. En la modalidad sustantiva, el debido proceso de ley impide que el Estado, al aprobar leyes o al realizar una actuación, afecte de manera irrazonable, arbitraria o caprichosa los intereses de propiedad o libertad. Rivera Santiago v. Srio. de Hacienda, 119 DPR 265 (1987); Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 DPR 881 (1993). Por su parte, bajo la modalidad procesal, el Estado tiene la obligación constitucional de garantizar que al interferir con un interés libertario o propietario de una persona se cumpla con un procedimiento justo y equitativo. González Aristud v. Hosp. Pavía, 168 DPR 127 (2006). En otras palabras, para privar a una persona de su libertad o propiedad, el Estado tiene que garantizar un proceso justo y equitativo que considere el interés propietario o libertario de la persona afectada por su actuación.
Ahora bien, para que se active la protección constitucional a un debido proceso de ley en su modalidad procesal, es necesario que exista un interés individual de libertad o propiedad que amerite la referida protección constitucional. Vázquez González v. Mun. de San Juan, 178 DPR 636 (2010); Rivera Santiago v. Srio. de Hacienda, supra. Es decir, “tiene que estar en juego un interés individual de libertad o propiedad”. Rivera Rodríguez & Co. v. Lee Stowell, etc., supra, pág. 888.
*164 A tales efectos, el Tribunal Supremo de Estados Unidos ha señalado que los intereses propietarios “are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits”. Board of Regents v. Roth, 408 US 564, 577 (1972). Determinada la existencia de un interés propietario o libertario, se activa la protección constitucional de la cláusula del debido proceso de ley de nuestra Constitución y de la Constitución de Estados Unidos, y procede entonces determinar cuál es el procedimiento exigido. Torres Solano v. P.R.T.C., 127 DPR 499, 529 (1990).
En ocasiones anteriores hemos reconocido que los empleados públicos de carrera tienen un interés en la retención de su empleo si dicho interés está protegido por ley o cuando por razón de las circunstancias se crea una expectativa de continuidad en el empleo. Orta v. Padilla Ayala, 131 DPR 227 (1992); Pierson Muller I v. Feijoó, 106 DPR 838 (1978). Igualmente, hemos señalado que empleados del gobierno que no gozaban de un puesto de carrera también tienen un interés propietario sobre el mismo.(14)
No obstante, ninguno de estos casos se enfrentaba al supuesto de que la Asamblea Legislativa, mediante legislación, hubiese abolido una oficina o departamento ejecutivo e incidentalmente se hubiese eliminado el cargo de un funcionario público. Tal análisis merece una discusión particular sobre las facultades y los poderes de la Asamblea Legislativa para abolir una agencia o departamento ejecutivo como corolario de la “facultad para crear, consolidar o *165 reorganizar departamentos ejecutivos y definir sus funciones”. Art. Ill, Sec. 16, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 396. A saber, ¿qué interés propietario, si alguno, posee un funcionario sobre un puesto creado por una ley que fue derogada por la Asamblea Legislativa en el ejercicio de sus facultades? Veamos.
B
Como parte del interés de nuestros constituyentes de establecer un sistema de pesos y contrapesos que garantice el equilibrio de poder entre nuestras tres ramas de gobierno, la Sección 16 del Artículo III de la Constitución de Puerto Rico dispone que la Asamblea Legislativa tendrá la facultad de crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones. Const. ELA, supra. Según hemos señalado en el pasado, con esta sección nuestros constituyentes quisieron “incorporar en nuestra jurisdicción [...] criterios similares a los adoptados en la jurisdicción federal en cuanto al alcance del poder de la Asamblea Legislativa para intervenir [...] con los poderes delegados a la Rama Ejecutiva”. Guzmán v. Calderón, supra, pág. 233.
Desde muy temprano en la jurisprudencia federal, el Tribunal Supremo de Estados Unidos reconoció que consustancial a la facultad del Congreso de crear agencias ejecutivas, está el poder para abolirías o modificarlas. Butler et al. v. Pennsylvania, 51 US (10 How.) 402 (1850). Posteriormente, fundamentándose en la determinación en Butler, el Tribunal Supremo federal señaló que “ ‘the legislative power of a State, except so far as restrained by its own constitution, is at all times absolute with respect to all offices within its reach. It may at pleasure create or abolish them, or modify their duties’ ”. Higginbotham v. Baton Rouge, 306 US 535, 538 (1939). Newton v. Commissioners, 100 US 548, 559 (1879).
En Newton v. Commissioners, supra, pág. 559, el Tribunal Supremo de Estados Unidos aclaró que tal poder legislativo responde al siguiente principio:
*166 Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of repeal and modification which the former had of enactment, neither more nor less. All occupy, in this respect, a footing of perfect equality. This must necessarily be so in the nature of things. It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require.
A tales efectos, en Lewis v. United States, 244 US 134 (1917), el Tribunal Supremo de Estados Unidos sostuvo que una legislación que abolía una ley mediante la cual se creaba un cargo público, tenía el efecto incidental de abolir el cargo público. Por tal razón, a partir de la fecha en que el cargo quedó abolido, el funcionario que ocupaba el cargo no tenía derecho a permanecer en el puesto ni a los beneficios que se derivaban de él. Id. Este razonamiento jurídico fue reafirmado en Higginbotham v. Baton Rouge, supra. En Higgingotham, el Tribunal Supremo de Estados Unidos sostuvo que la Asamblea Legislativa tenía el poder para abolir o modificar las agencias ejecutivas y modificar los términos, deberes y funciones de sus funcionarios. Por tal razón, denegó la reclamación que presentó el señor Higginbotham sobre su cargo, empleo que tenía un término que no había concluido.
En el caso de Puerto Rico, el único límite plasmado en nuestra Constitución a tal facultad legislativa se refiere a aquellos departamentos ejecutivos creados en virtud de la propia Constitución. Art. IV, Sec. 6, Const. ELA, LPRA, Tomo 1. Por consiguiente, fuera de los departamentos ejecutivos establecidos por mandato constitucional, la Asamblea Legislativa tiene plena facultad “para crear, reorganizar y consolidar departamentos ejecutivos de gobierno, y para definir sus funciones [...]”. íd., pág. 409. Facultad que conlleva, necesariamente, el poder para abolir los departamentos ejecutivos creados. Butler et al. v. Pennsylvania, supra.
Sin embargo, en reconocimiento del poder de nombramiento del ejecutivo y del balance de poderes entre las ramas de gobierno, hemos señalado que la Asamblea Legis *167 lativa, en el ejercicio de su facultad de legislar sobre los departamentos ejecutivos, no puede afectar irrestrictamente el poder de nombramiento del gobernador y, consustancial a este poder, el poder de destitución. Santana v. Gobernadora, supra, pág. 74. Por tal razón, tanto en Guzmán v. Calderón como en Santana, evaluamos las restricciones impuestas por la Asamblea Legislativa al poder de destitución del gobernador sobre funcionarios ejecutivos y adoptamos la jurisprudencia federal sobre tales casos.
Distintas son, sin embargo, aquellas instancias en que, tal y como reseñamos en la esfera federal, la Asamblea Legislativa opta por eliminar o abolir un departamento, agencia o dependencia del Ejecutivo e incidentalmente elimina un cargo público. Esta controversia fue atendida y resuelta por este Tribunal en Gómez v. Negrón, supra. En Gómez, citando con aprobación la jurisprudencia federal antes reseñada,(15) sostuvimos que
Está firmemente establecido [...] que al abolir un cargo creado por la Legislatura no se priva al incumbente de ningún derecho constitucional. No existe ningún derecho contractual o interés de propiedad en relación con la aceptación de un cargo de creación legislativa y el incumbente lo acepta bajo el entendido de que el mismo puede ser abolido en cualquier momento. Gómez, supra, pág. 312.
Según surge de los hechos del caso, el señor Gómez fue nombrado por el Gobernador con el consentimiento del Senado para ocupar el cargo de Fiscal del Tribunal Supremo por cuatro años, mediante la Ley Núm. 39 de 7 de marzo de 1912 (Ley Núm. 39), 3 LPRA ants. secs. 84-85Í (derogadas). Posteriormente, la Ley Núm. 39 fue enmendada por la Asamblea Legislativa mediante la aprobación de la Ley Núm. 270 de 14 de mayo de 1945 (3 LPRA ant. see. 85) (derogada)). Esta última legislación creó el cargo de Procurador General Auxiliar y Fiscal del Tribunal *168 Supremo. Así las cosas, el Procurador General optó por no nombrar al señor Gómez para ocupar la plaza recién creada. Adujo que por considerar que el puesto de Gómez había sido abolido por la Ley Núm. 270, tenía la facultad de nombrar a la persona de su predilección al puesto recién creado. En desacuerdo, el señor Gómez presentó un recurso de mandamus para que se ordenara su reinstalación en el puesto. Alegó que la Asamblea Legislativa se limitó a realizar una leve alteración en la designación oficial, pero que el puesto tenía las mismas obligaciones, atribuciones y deberes del puesto abolido.
No obstante, contrario a la alegación del señor Gómez, señalamos que “cuando exista la más leve diferencia entre dos cargos, no por su designación oficial, sino en cuanto a su naturaleza, no puede sostenerse que el cargo anterior no ha sido abolido”. (Énfasis suplido). Gómez v. Negrón, supra, pág. 311. A tales fines, reconocimos que la Legislatura puede establecer un nuevo sistema de gobierno para las instituciones o departamentos creados mediante un plan anterior y “abolir el plan [...] y los cargos creados para la administración de ese plan, en su totalidad o en parte”. Id., pág. 313. Finalmente, señalamos que “[e]n cuanto a la sabiduría, conveniencia o motivos que haya tenido la Legislatura para actuar en la forma en que lo ha hecho, no concierne a la rama judicial, dentro de nuestro sistema de separación de poderes, entrar a investigarlos o discutirlos”. (Énfasis suplido). Id., pág. 314. Por consiguiente, podemos colegir que en Gómez, este Tribunal estableció un criterio objetivo para evaluar si, en efecto, las actuaciones de la Asamblea Legislativa iban dirigidas únicamente a remover al incumbente; a saber, el criterio de análisis exige que la naturaleza del cargo varíe mediante la promulgación de una ley que elimine el departamento ejecutivo e incidentalmente el cargo anterior.(16)
*169 De acuerdo con la normativa antes reseñada, no albergamos duda de que la facultad de la Asamblea Legislativa para abolir o reorganizar un departamento e incidentalmente abolir un cargo está contemplada en el poder legislativo para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones. En el caso de una legislación que tenga como propósito eliminar una oficina y crear una nueva, lo que procede es evaluar si se le conceden nuevas facultades y deberes a la oficina de nueva creación en comparación con la anterior. En caso de que así se haya hecho, un funcionario público no puede albergar un interés propietario sobre un cargo que ha sido abolido o eliminado por disposición estatutaria. Por su parte, una vez la Asamblea Legislativa aprueba la abolición, eliminación o reorganización de un departamento ejecutivo, conforme a la facultad conferida por nuestra Constitución, compete al poder ejecutivo aprobar o vetar la legislación y, de aprobarla, actuar conforme al mandato legislativo.
IV
En esta controversia, la Asamblea Legislativa, en virtud de su facultad de abolir o reorganizar departamentos, optó por derogar el Plan de Reorganización mediante la aprobación de la Ley Núm. 75. Lo cual, para todos los efectos prácticos, abolió las procuradurías creadas mediante el Plan de Reorganización, entre éstas, la Oficina del Procurador de la Personas con Impedimentos y la Oficina para la Administración de las Procuradurías (OAP). Esto provocó que, incidentalmente, se eliminara el cargo del señor Díaz Carrasquillo y de los demás procuradores nombrados como resultado del Plan de Reorganización. Coetáneamente, la *170 Asamblea Legislativa aprobó la Ley Núm. 78, por la cual “[s]e crea la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico”. Art. 2 de la Ley Núm. 78 de 24 de julio de 2013. Tanto en la Ley Núm. 75 como en la Ley Núm. 78, se dispuso que entrarían en vigor en un término de treinta (30) días después de su aprobación, periodo que se utilizaría para hacer la transición entre la OAP y las procuradurías de recién creación.
A tales fines, y en cumplimiento con el mandato legislativo, el Gobernador nombró un Comité de Transición y, eventualmente, nominó a un procurador interino a la Oficina del Procurador de las Personas con Impedimentos. No queda duda, entonces, de que el rol de un tribunal de derecho en esta controversia (y no la transmutada por la mayoría) se limitaba a determinar si la actuación legislativa cumple con los parámetros establecidos en la jurisprudencia federal y la puertorriqueña sobre el poder de la Asamblea Legislativa para abolir o reorganizar un departamento ejecutivo. En específico, a evaluar si en el ejercicio de tal facultad, la actuación legislativa no estaba dirigida a remover al señor Díaz Carrasquillo conforme a los criterios objetivos establecidos en Gómez v. Negrón, supra. Procede que, para efectos de la discusión de este caso en “los méritos”, evaluemos los deberes y las facultades de la extinta Oficina del Procurador de las Personas con Impedimentos en comparación con los de la oficina recién creada.
Según mencionamos, conforme al Plan de Reorganización se creó la OAP, organismo bajo el cual se consolidaron todas las facultades, funciones y deberes administrativos de las procuradurías. Con la creación de esta oficina, el plan pretendía que los procuradores se enfocaran más en los asuntos que afectaban a la población que representaban y no en gestiones de índole administrativa. A tales efectos, se dispuso que con la consolidación de las funciones administrativas de las procuradurías bajo el mando de *171 la OAP “se persigue la integración de los servicios de las oficinas destinadas a las finanzas, recursos humanos, compras, tecnología de informática, radicación de querellas, trámites y notificaciones y otras que rinden servicios similares en cada Procuraduría”. Art. 2 del Plan de Reorganización Núm. 1 de 2011 (3 LPRAAp. XVII) (Supl. 2012).
Es decir, la nueva Oficina del Procurador de las Personas con Impedimentos, creada por el Plan de Reorganización, eliminó poderes y deberes del procurador al tiempo que sometió a las distintas oficinas, entre éstas, la Oficina del Procurador de las Personas con Impedimentos, a la supervisión de la OAP. A tales fines, limitó las facultades de las Oficina del Procurador de las Personas con Impedimentos, esencialmente a
[...] atender e investigar los reclamos de las personas con impedimentos en las áreas de la educación, la salud, el empleo y la libre iniciativa empresarial o comercial de los derechos civiles y políticos, de la legislación social, laboral y contributivo, de la vivienda, la transportación, la recreación, la protección del medio ambiente y la cultura, entre otras. Art. 2 del Plan de Reorganización Núm. 1 de 2011, supra.
A manera de ilustración, el Plan de Reorganización de 2011 creaba el puesto de administrador de las procuradurías y éste, entre otras cosas, estaba encargado de gestionar y recibir el presupuesto, tanto de su oficina, la OAP, como de las procuradurías;(17) debía establecer un programa a través del cual la población que atendía cada pro *172 curaduría podía canalizar sus quejas para luego referirlas a los procuradores,(18) y tenía la función de planificar, organizar y dirigir los asuntos y las transacciones relacionadas con el manejo y gobierno interno de la OAP y de las procuradurías. Específicamente, se le encargaron “todos los asuntos y operaciones relacionadas con los recursos humanos, contratación de servicios, asignación presupuestaria, adquisición, uso y control de equipo, medios de comunicación y tecnología, prensa, materiales y propiedad, reproducción de documentos y otros materiales”(19) Art. 6(a) del Plan de Reorganización Núm. 1 de 2011 (3 LPRA Ap. XVII).
Ya que la Ley Núm. 75 eliminó la OAP, los deberes previamente mencionados recayeron en cada una de las procuradurías creadas posteriormente, entre las cuales se encuentra la Oficina del Procurador de las Personas con Impedimentos creada por la Ley Núm. 78. Como resultado, a la nueva oficina se le otorgaron mayores deberes que a la derogada; como por ejemplo, el manejo de las querellas presentadas, del presupuesto y del reclutamiento necesario para llevar a cabo los propósitos de la Ley Núm. 78, sin la colaboración de una oficina administrativa que se encargue de ello como lo hacía la OAP.
A su vez, mediante la nueva ley, el procurador tiene el deber de “[d]eterminar la organización interna de la oficina y establecer los sistemas que sean menester para su ade *173 cuado funcionamiento y operación, así como llevar a cabo las acciones administrativas y gerenciales necesarias para la implantación de esta Ley”, sin la colaboración que la OAP le brindaba bajo el Plan de Reorganización derogado. Art. 9(a) de la Ley Núm. 78 de 24 de julio de 2013. En reconocimiento de los nuevos deberes del procurador bajo la Ley Núm. 78, la Asamblea Legislativa le otorgó expresamente la facultad de nombrar un procurador auxiliar para delegarle cualquiera de las funciones dispuestas en la ley.(20)
A base de lo anterior, queda meridianamente claro que la Ley Núm. 78 tuvo como propósito crear una nueva Oficina del Procurador de las Personas con Impedimentos, tal y como dispone expresamente la ley.(21) Además, existe más que una leve diferencia entre las dos oficinas. La oficina pasó de ser una entidad encargada de la fiscalización, a una encargada de la fiscalización, el manejo y la administración de toda la estructura de la nueva procuraduría, así como de los empleados y funcionarios a su cargo. Después de todo, esto fue lo que provocó que, en un principio, se aprobara el Plan de Reorganización de 2011, a saber, eliminar facultades a los procuradores para que estos se encargaran únicamente del ejercicio fiscalizador de la agencia. De ahí que el legislador, bajo el Plan de Reorgani *174 zación de 2011, optara por crear una oficina encargada de las facultades administrativas. Por el contrario, la Asamblea Legislativa actual quiso cambiar nuevamente la estructura operacional de las procuradurías y para ello creó un andamiaje administrativo similar al existente previo a la aprobación del Plan de Reorganización de 2011.
Por lo tanto, si estableciéramos que de acuerdo con el Plan de Reorganización de 2011, y las Leyes Núms. 75 y 78 no hubo un cambio significativo en las facultades y funciones de los procuradores, negaríamos precisamente la esencia misma por la cual fueron impulsadas estas propuestas legislativas. En ambos proyectos, lo que se pretendía cambiar, y lo que efectivamente se cambió, fueron las facultades de los procuradores —aunque por fundamentos distintos y con un resultado distinto— y como consecuencia, el funcionamiento, operación y administración de la oficina.
Por eso, la Asamblea Legislativa actual optó por crear una nueva estructura organizacional en la Oficina del Procurador de las Personas con Impedimentos y, en tal encomienda, cambió la naturaleza y las facultades de la oficina derogada. La actuación legislativa no iba dirigida a remover al señor Díaz Carrasquillo de su cargo, sino a establecer la nueva política pública y el andamiaje de las procuradurías. Si bien uno de los efectos incidentales de esta actuación legislativa fue la eliminación del cargo que ocupaba el señor Díaz Carrasquillo, ello se hizo conforme a los parámetros establecidos en Gómez v. Negro n, supra. Es decir, la Asamblea Legislativa varió sustancialmente la naturaleza del cargo que ocupaba el señor Díaz Carrasquillo mediante la creación del nuevo cargo. No compete a este foro evaluar la sapiencia de este acto legislativo investido por disposición constitucional en la Asamblea Legislativa. De lo contrario, atentaríamos contra la separación de poderes, piedra angular de nuestra estructura constitucional.
De acuerdo con lo anterior, y conforme a lo resuelto en Gómez v. Negrón, supra, entendemos que las Leyes Núms. *175 75 y 78 abolieron la Oficina del Procurador de las Personas con Impedimentos creada por el Plan de Reorganización de 2011, lo cual ocasionó que incidentalmente se eliminara el cargo que ocupaba el señor Díaz Carrasquillo y se creara una oficina con facultades adicionales a las que tenía el entonces procurador. Mediante la concesión de facultades adicionales, la Asamblea Legislativa cambió la naturaleza y las facultades de la Oficina del Procurador de las Personas con Impedimentos. Por tal razón, la promulgación de las Leyes Núms. 75 y 78 fue un acto válido conforme a los poderes otorgados por nuestra Constitución a la Asamblea Legislativa. Ante la eliminación válida de su cargo, el señor Díaz Carrasquillo no tenía un derecho o interés propietario sobre el cargo. Tal consecuencia es incidental a nuestro sistema democrático de derecho y al poder constitucional que le fue conferido a la Asamblea Legislativa.
Hoy, la mayoría, luego de discutir en detalle cada una de las preguntas certificadas, procede a discutir el interés propietario de un funcionario ejecutivo cuyo puesto fue incidentalmente eliminado mediante una legislación que abolió la ley que creaba su puesto. Tal discusión merece dos señalamientos. Primero, resulta paradojal que la mayoría proceda a discutir las preguntas certificadas y que, además, atienda la controversia sobre el interés propietario de un funcionario cuyo puesto fue eliminado. De haber entendido que efectivamente la controversia ante nuestra consideración versaba sobre la relación de hechos certificada —a saber, la destitución de un funcionario ejecutivo que ejerce funciones cuasijudiciales— resulta innecesaria toda discusión sobre el interés propietario de un funcionario cuyo puesto fue eliminado por la Asamblea Legislativa. Por el contrario, de haber entendido que la controversia no versaba sobre el asunto certificado, procedía denegar o anular la certificación jurisdiccional. No obstante, la mayoría se adentra a discutir ambas controversias sin aparente comprensión sobre lo anterior o, al menos, un intento por conciliar ambas discusiones.
*176 Segundo, la mayoría reafirma la vigencia y aplicación de Gómez v. Negrón, supra, en nuestro ordenamiento. Es decir, la mayoría reconoce que la vigencia de este precedente nunca ha estado en controversia. Sin embargo, mediante una ininteligible y escueta argumentación jurídica pretende alterar su aplicación a la controversia resuelta por el Tribunal de Apelaciones para el Primer Circuito. Ello denota, según hemos señalado, un claro desdén hacia las normas básicas de autolimitación judicial y los principios del federalismo.
Según hemos fundamentado en derecho, el señor Díaz Carrasquillo no tiene un derecho o interés propietario sobre el cargo, el cual fue abolido válidamente por la Asamblea Legislativa. Por todo lo anterior, anularía la certificación interjurisdiccional expedida. Por los fundamentos expresados, disiento del curso de acción trazado por la mayoría.

 En específico, el Plan reorganizó la estructura vigente que regía la administración y operación de las oficinas siguientes: la Procuraduría de las Personas con Impedimentos, la Procuraduría de la Salud, la Procuraduría de Personas Pensionadas y de la Tercera Edad, y la Procuraduría del Veterano.

 Mediante esta ley, se derogó la Ley Núm. 2 de 27 de septiembre de 1985, la Ley Núm. 57 de 27 de junio de 1987, la Ley Núm. 11 de 11 de abril de 2001, la Ley *144 Núm. 203 de 7 de agosto de 2004 y se enmendó la Ley Núm. 203 de 14 de diciembre de 2007.

 Anterior a esta legislación, las procuradurías funcionaban como entes independientes. A manera de ilustración, en el artículo 3 de la Ley Núm. 2 de 27 de septiembre de 1985 se especificaba que se creaba la Oficina del Procurador de las Personas con Impedimentos, “como una entidad jurídica, independiente y separada de cualquier otra agencia o entidad pública”.

 Las preguntas formuladas fueron las siguientes:
“(1) Does the Ombudsman for Persons with Disabilities of Puerto Rico, because of his functions, enjoy limited property right to remain in his position for the duration of his fixed term subject to ‘just cause’ as defined by law?
“(2) Should the ‘just cause’ restrictions imposed on the Governor for removing Plaintiff from his position be considered an interference with Governor’s ability to perform his constitutional duty and properly execute the duties of his office?
“(3) What factors should the Court utilize when making such a determination?
“(4) If there is a limited property right under Puerto Rico law, does Plaintiff lose his right under the doctrine of legislative immunity as asserted by Defendants?” Apéndice del recurso de certificación inteijurisdiccional, Documento 75, pág. 12.

 En esencia, argumentó que el foro apelativo federal erró al fundamentar su determinación en Gómez v. Negrón, 65 DPR 305 (1945), ya que este caso fue decidido previo a la promulgación de la Constitución del Estado Libre Asociado. Por lo cual, el Tribunal debe hacer un análisis del derecho de propiedad que alega tener el demandante considerando los derechos concedidos por la Constitución y su jurisprudencia interpretativa.

 Véase, por ejemplo, Nota, The Validity of the Restrictions on the Modern Advisory Opinion, 29 Maine L. Rev. 305, 310 (1978), en donde se señala: “The separation of governmental powers insulates the judiciary from encroachment by the other branches of government, thereby placing responsibility on the Justices to apply the law according to their best judgment”.

 Para una crítica a nuestra determinación en E.L.A. v. Aguayo, 80 DPR 552 (1958). Véase J.J. Alvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, págs. 96-101; J.J. Álvarez González, La protección de los derechos humanos en Puerto Rico, 57 Rev. Jur. UPR 133, 165-167 (1988).

 Este mecanismo es relativamente novel en la jurisprudencia federal, pues fue adoptado para finales de la del siglo xx. Hon. B.M. Selya, Certified Madness: Ask a Silly Question, 29 Suffolk U.L. Rev. 677, 680-681 (1995).

 Así vemos que si bien la Ley de la Judicatura de 2003 flexibilizó la normativa sobre las certificaciones inteijurisdiccionales, aún permanece el requisito de que la decisión emitida por este Foro pueda determinar el resultado del pleito ante el foro federal. Guzmán v. Calderón, 164 DPR 220, 229 (2005).

 Según surge de la solicitud de certificación, el foro federal primario señaló que el señor Díaz Carrasquillo demostró que el cargo de Procurador para las Personas con Impedimentos ejerce funciones ejecutivas y cuasijudiciales.

 De hecho, los casos citados por la opinión mayoritaria atienden la aplicabilidad de la inmunidad legislativa en situaciones donde se presentaron acciones por discrimen. Ningún caso citado evaluó mi conflicto entre el derecho propietario de un ciudadano y la inmunidad legislativa, pues nuestro ordenamiento no admite dicho choque.

 En Torres Rivera v. Calderon Serra, 412 F.3d 205 (1er Cir. 2005), el Tribunal de Apelaciones para el Primer Circuito atendió una controversia similar a este asunto. Allí, el foro apelativo intermedio federal tuvo ante sí una controversia originada por los siguientes hechos. El entonces Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Pedro Rosselló González, aprobó una legislación para restrueturar la Comisión Industrial y aumentar el número de comisionados en esa entidad de cinco (5) comisionados a veinticinco (25). A estos los nombraría el gobernador, con el consejo y consentimiento del Senado, por un término fijo. La legislación dispuso que los comisionados en función al momento de la restructuración, continuarían ejerciendo el cargo hasta que venciera su término.
Eventualmente, la sucesora en la gobernación, Hon. Sila M. Calderón, aprobó una legislación en la que se enmendó la aprobada bajo la administración del Gobernador Rosselló González. Mediante esta legislación, se estableció una nueva estructura en la Comisión Industrial y se redujo el número de comisionados de veinticinco (25) a cinco (5). La legislación dispuso que a los cinco (5) miembros los nombraría la Gobernadora. Nada se dijo sobre los comisionados que estaban en funciones cuando se aprobó la legislación. Posteriormente, el entonces Secretario de la gobernación, Hon. Ferdinand Mercado, envió una carta a los veinticinco (25) comisionados nombrados bajo la estructura anterior, en la que les notificó sobre la terminación de sus funciones de acuerdo con la legislación aprobada. Así las cosas, varios de los comisionados destituidos mediante la legislación presentaron una reclamación ante el Tribunal de Distrito en contra de la Gobernadora Sila M. Calderón y otros funcionarios. Alegaron, entre otras cosas, que el estatuto era inconstitucional porque iba dirigido a removerlos mediando discriminen político en contra de éstos y violaba sus derechos a la libertad de expresión y asociación porque ellos estaban afiliados al PNP.
Ante estos hechos, el foro apelativo intermedio federal confirmó la determinación del foro federal primario y concluyó, entre otras cosas, que el estatuto no era inconstitucional bajo el análisis de la Primera Enmienda de la Constitución federal. A su vez, desestimó la reclamación de discrimen en contra de la Gobernadora bajo la garantía de inmunidad parlamentaria extendida a la firma y aprobación de una legislación por el ejecutivo, y desestimó la reclamación en contra de los funcionarios ejecutivos bajo la doctrina federal de inmunidad condicionada. En lo pertinente, señaló: “there is no statutory invalidity from the fact that the statute may, in the end, lead to a situation in which the impact of the reorganization will be to disproportionally terminate the employment of members of one political party”. Torres Rivera, supra, pág. 211.

 Como bien reconoce el Juez Asociado Señor Martínez Torres en su Opinión de conformidad, el foro apelativo intermedio federal no encontró una laguna doctrinal que incitara dudas sobre la interpretación correcta del derecho puertorriqueño aplicable. Al adjudicar la controversia ante su consideración, el Tribunal de Apelaciones para el Primer Circuito tácitamente reconoció la inmaterialidad de las preguntas certificadas por el Tribunal de Distrito.
Contrario a lo que sostiene el Juez Asociado, el Tribunal de Apelaciones no estaba obligado a mostrar deferencia alguna a nuestra decisión de acoger la certificación. Si bien el Tribunal Supremo de Estados Unidos expresó en Arizonans que los tribunales federales deben evitar especular sobre el significado de un estatuto estatal cuando no ha sido interpretado por el máximo foro estatal y está disponible el mecanismo de certificación, ese foro fundamentó su conclusión en que la controversia según el derecho estatal evitaría una adjudicación innecesaria bajo la constitución federal. Arizonans for Official English v. Arizona, 520 US 43, 73 (1997). Ése es el verdadero ámbito de la llamada abstención o doctrina Pullman: cuando en circunstancias especiales surge una incertidumbre sustancial sobre la interpretación del derecho estatal y existe una probabilidad razonable de que aclarar esa interpretación evitaría una adjudicación al amparo de la constitución federal, un tribunal federal se debe abstener de adjudicar la controversia hasta cuando se termine de litigar el caso en el foro estatal. Chemerinsky, pág. 818, Sec. 12.2.
No procede invocar la doctrina de abstención Pullman meramente porque el foro estatal no ha considerado la constitucionalidad del estatuto impugnado al amparo de *162 su constitución. Chemerinsky, pág. 820. La ausencia de una interpretación de un foro estatal no es, de por sí sola, suficiente para causar duda sobre la interpretación adecuada íd. Tampoco procede invocar la abstención Pullman cuando la disposición constitucional estatal contiene disposiciones análogas a la constitución federal, como resulta evidente en la controversia ante nosotros, o para meramente otorgarle al tribunal estatal la oportunidad de decidir la controversia antes que el foro federal. Chemerinsky, pág. 821, citando a Wisconsin v. Constantineau, 400 US 433, 439 (1971), y Zwickler v. Koota, 389 US 241, 251 (1967). En este caso, ni siquiera existía una incertidumbre, mucho menos sustancial, pues el Tribunal de Apelaciones para el Primer Circuito contaba con el precedente de Gómez v. Negrón, 65 DPR 305 (1945), que atiende a cabalidad la controversia que estuvo ante su consideración. De hecho, irónicamente, en la opinión consultiva que hoy emite la mayoría se reafirma mediante malabarismos judiciales la norma allí establecida.

 Por ejemplo, hemos reconocido el interés propietario de una empleada escolar sobre la expectativa, como consecuencia de un contrato implícito, de que el puesto transitorio en que se desempeñaba se convirtiese en permanente. Lupiáñez v. Srio. de Instrucción, 105 DPR 696 (1977). A su vez, hemos reconocido el interés propietario de un alcalde sobre el sueldo, los beneficios marginales y el ejercicio del cargo para el cual fue electo, al haber sido suspendido de su cargo por el gobernador cuando todavía quedaba pendiente la formulación de cargos en su contra. Vélez Ramírez v. Romero Barceló, 112 DPR 716 (1982).

 En específico, hicimos referencia a la trilogía de casos Higginbotham v. Baton Rouge, 306 US 535, 538 (1939); Newton v. Commissioners, 100 US 548, 559 (1879); Butler et al. v. Pennsylvania, 51 US (10 How.) 402 (1850).

 La adopción de estos parámetros no fue novel para un tribunal estatal de más alta jerarquía, pues un repaso histórico da cuenta de que estos parámetros *169 fueron adoptados con anterioridad a nuestra determinación por tribunales de más alta jerarquía en distintos estados de Estados Unidos al analizar casos en que, mediante legislación, la Asamblea Legislativa abolía una oficina e, incidentalmente, eliminaba un cargo público. Véanse: State ex rel. Hammond v. Maxfield, 132 P.2d 660 (Utah 1942) O’Connor v. Greene, 21 N.Y.S.2d 631 (New York, 1940).

 “Art. 6-Funciones y Facultades del Administrador
“(d) gestionar, recibir, formular, ejecutar el control del presupuesto y garantizar que los fondos provenientes de asignaciones legislativas, federales o estatales, y de transferencias, delegaciones, aportaciones y donativos que se reciban para la operación de la OAP y de las Procuradurías sean utilizados, conforme a sus propósitos y a las delegaciones hechas en este Plan. Los fondos disponibles serán evaluados y contabilizados conforme a la estructura programática aprobada, cuya ejecución tendrá medidas de control, establecidos por la OAP y sujeto a las leyes que regulan el uso de fondos públicos, normas o reglas en virtud de los cuales los reciba la OAP o las Procuradurías, según los reglamentos que el Administrador adopte para esos fines”. 3 LPRAAp. XVII (Supl. 2012).

 “Art. 6-Funciones y Facultades del Administrador
“(i)establecer como parte de su estructura, un área o programa a través del cual la población que atiende cada Procuraduría, pueda canalizar sus quejas o reclamos en caso de violación de derechos, inacción de las agencias o de servir de enlace entre éstos y la agencia concernida”. Id.

 “Art. 6-Funciones y Facultades del Administrador
“(a) Planificar, organizar y dirigir todos los asuntos y operaciones relacionadas con los recursos humanos, contratación de servicios, asignación presupuestaria, adquisición, uso y control de equipo, medios de comunicación y tecnología, prensa, materiales y propiedad, reproducción de documentos y otros materiales; y demás asuntos y transacciones relacionadas al manejo y gobierno interno de la OAP y de las Procuradurías”. Id.

 “Artículo 5.- Nombramiento del Procurador de las Personas con Impedimentos y del Procurador Auxiliar
“(b) El Procurador podrá nombrar un Procurador Auxiliar y delegarle cualquiera de las funciones dispuestas en esta Ley”.

 “Artículo 2.- [Creación]
“Creación de la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico
“Se crea la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico.

“Artículo 4- Creación de la Oficina del Procurador de las Personas con Impedimentos

“Se crea la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico como una entidad jurídica independiente y separada de cualquier otra agencia [...]”.